**In re CONSOLIDATED LITIGATION CONCERNING INTERNATIONAL HARVESTER'S DISPOSITION OF WISCONSIN STEEL.**

Nos. 81 C 7076, 82 C 6895 and 85 C 3521.

United States District Court,
N.D. Illinois, E.D.

March 2, 1988.

Leonard A. Grossman, Office of the Sol., Dept. of Labor, Chicago, Ill., William O. Bittman, George R. Clark, T. Timothy Ryan, Jr., Richard D. Lerner, Pirerson, Ball & Dowd, Washington, D.C., Gary Ford, Gen. Counsel, Robert L. Furst, Asst. Gen. Counsel, Melinda Tell Lazare, Pension Benefit Guar. Corp. Washington, D.C., for plaintiff.

Arthur C. O'Meara III, Navistar Intern. Corp., Donald G. Kempf, Jr., Philip S. Beck, Chaim T. Kiffel, David J. Zott, Kirkland & Ellis, Chicago, Ill., for defendant.

### MEMORANDUM AND ORDER

MORAN, District Judge.

These consolidated cases follow in the wake of the bankruptcy of Wisconsin Steel Corporation and its related companies (WSC), consisting of corporations associated with Envirodyne Industries, Inc. Wisconsin Steel, a steel mill on the south side of Chicago, had been a division of International Harvester Co., today known as Navistar Corp. (IH), until 1977, when it was sold to WSC. Since WSC is insolvent, many persons with claims against it seek to make IH responsible for those claims.

Currently before the court is a motion relating to one of those claimants. The Pension Benefit Guaranty Corporation (PBGC), under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* (ERISA), must step in to pay unfunded vested pension benefits to former Wisconsin Steel employees out of the PBGC insurance program since WSC cannot. The PBGC contends that under 29

U.S.C. § 1362, IH, the solvent employer who first promised most of those benefits to these employees, must reimburse it for those payments, up to 30% of IH's net worth. Specifically, the PBGC asks that this court find two pension plans terminated, fix a date of termination, appoint the PBGC trustee of the plans pursuant to 29 U.S.C. §§ 1342 and 1348, and issue a declaratory judgment that IH is liable to the PBGC under § 1362. For its part IH, after some six years of bitterly-fought discovery, and on virtually the eve of trial, moves to dismiss the PBGC's entire complaint for failure to state a claim upon which relief can be granted. The motion is granted in part and denied in part.

### BACKGROUND

Some of the factual background to these cases may be found in *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel*, 666 F.Supp. 1148 (N.D.Ill.1987), and *In re Wisconsin Steel Corp.*, 48 B.R. 753 (N.D.Ill.1985). Wisconsin Steel Works was founded in 1875 and became a division of International Harvester Co. in 1902. The mill produced steel bars, including bars in special sizes and shapes not readily available elsewhere, which IH used in its manufacture of trucks, agricultural machinery, and construction and industrial equipment. By the 1970s the Wisconsin Steel Division of IH included not only the mill but also coal mines in Kentucky, iron mines in Michigan, a railroad, and two ore-carrying vessels on the Great Lakes.

By the 1970s the division also was incurring substantial operating losses, probably nearly $40 million between 1972 and 1977. Virtually all of these losses seem to have been traceable to steel-making operations. Apparently the century-old plant had not kept pace with technological developments in the steel industry. By IH's own estimate, it needed many millions in capital improvements to become competitive, an investment IH was unwilling to make. Also, collective bargaining agreements had led to pension obligations. These included an unfunded liability variously estimated at between $45 and $86 million. IH decided to look for a buyer.

The search lasted for several years. During that time IH may have offered the division to as many as 70 different firms, with no takers. Finally, in 1976 serious discussions began with officers of Envirodyne, Inc. (as it was then known), a small environmental engineering consulting firm from California. The division's net worth dwarfed that of Envirodyne, and Envirodyne had no experience in any aspect of the steel industry. The transaction as eventually worked out was a 100% leveraged buy-out. *See, e.g., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1292 (3d Cir.1986) (explaining leveraged buyout), *cert. denied,* —— U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). Envirodyne created a number of wholly-owned subsidiaries (collectively called WSC here) to hold title to assets of the division. IH loaned them $50 million of the total sale price of $65 million. In return IH got notes from the subsidiaries secured by most of the division's assets, including the coal and iron mines. The remaining $15 million came from a loan from Chase Manhattan Bank secured by the mill's inventory and accounts receivable. The newly formed WSC agreed to take over all the pension obligations of the division. The sale was effective July 31, 1977.

During the next three years, however, IH continued to control the pension trust funds. Indeed, though WSC filed for bankruptcy on March 31, 1980, IH did not turn over the pension funds to WSC until August 25, 1980. The PBGC alleges that IH also controlled other significant aspects of WSC. Its position, loosely, is that WSC from August 1977 to March 1980 should be deemed still a division of IH, despite the sale. The PBGC contends that IH still needed the specialty steel bars which only WSC made, and so could not afford to shut the plant down. The sale, however, gave IH an opportunity to evade some or all of the division's liabilities. Then a long strike at IH's manufacturing facilities gave it a further opportunity, namely to stockpile WSC steel bars. During the strike IH accumulated enough of the specialty steel to

give it sufficient lead time to find an alternate supplier. Shortly after the strike ended IH foreclosed on its mortgages and security interests.

IH finds this PBGC scenario ridiculous. It says that it merely exercised good business judgment in all the transactions. The sale was the best deal it could find, and the new WSC stood a reasonable chance of success. During WSC's brief existence IH exercised only that degree of control which any major creditor would exercise. The foreclosures were postponed as long as possible.

Whatever the resolution of these questions, IH's foreclosures triggered the bankruptcy of WSC. WSC could not pay the bulk of the pension obligations and the employees turned to the PBGC. The PBGC turned to IH, which refused to pay on the ground that the sale to WSC had insulated it from all ERISA liability. This lawsuit followed.

## DISCUSSION

Congress passed ERISA in 1974 in order to provide greater pension security for the employees of America. *Nachman Corp. v. PBGC*, 446 U.S. 359, 362, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980). The Act's provisions for pension insurance in effect provide each employee with an insurance policy against his employer's breach of contract on pension matters. The PBGC is the insurer, paying from a fund created from premiums paid by every American employer with a pension plan.

■■■ Employer liability, an essential feature of the insurance subtitle, prevents employer abuse of the program. *Connolly v. PBGC*, 475 U.S. 211, 214, 106 S.Ct. 108, 1020, 89 L.Ed.2d 166 (1986); S.Rep. No. 127, 93d Cong., 1st Sess., *reprinted in* 1 Legislative History of the Employee Retirement Income Security Act of 1974 [hereinafter Leg.Hist.] 612 (1976); H.R.Rep. No. 533, 93d Cong., 1st Sess., 1974, U.S.Code Cong. & Admin.News, 4639, 2 Leg.Hist. 2363. As currently constituted, the legislation includes different provisions for single-employer and multi-employer plans. Multi-employer plans have, since 1980, been governed by the Multi-employer Pension Plan Amendments Act (MPPAA), 29 U.S.C. §§ 1381 *et seq.* Under the MPPAA liability is incurred when an employer withdraws from a pension plan and it runs to the plan itself. *See generally Connolly*, 475 U.S. at 214–15, 106 S.Ct. at 1020–21; *PBGC v. Heppenstall Co.*, 633 F.2d 293, 295–96 (3d Cir.1980). For single-employer plans, however, liability is incurred at termination of the plan and it runs directly to the PBGC. *Nachman*, 446 U.S. at 363, 100 S.Ct. at 1727. If the employer has failed to fund any ERISA-insured pension obligations the PBGC has in effect an insurer's claim for subrogation. *See Nachman Corp. v. PBGC*, 592 F.2d 947, 957 (7th Cir.1979) (liability provisions are in part a subrogation scheme), *aff'd*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). If the employee cannot collect from his employer on a pension insured under ERISA, then the PBGC pays the guaranteed amount. But the PBGC is in effect subrogated to the employee's claim against the employer and may pursue the non-paying employer up to 30% of the latter's net worth. *Nachman*, 592 F.2d at 957, 963.

Wisconsin Steel had a single-employer plan. Thus all the PBGC's claims which attempt to assert employer liability against IH turn on construction of the employer liability provision of ERISA which governed single-employer plans until 1986, the former 29 U.S.C. § 1362 (1982). There is no question that one of the statute's prerequisites to a claim has been met. The value of the benefits in the Wisconsin Steel plans guaranteed by ERISA exceeds the value of the plan's assets allocable to those benefits. Rather, this dispute centers around § 1362(a), which reads in pertinent part: "This section applies to any employer who maintained a single-employer plan at the time it was terminated...." Its resolution requires statutory interpretation in light of the legislative purpose but without much guidance from the statutory language and with little specific guidance from the legislative history. The developing judicial gloss is also of limited assistance and we are, therefore, left with the

task of choosing a legal standard, from among various possible standards, which appears to most closely conform to both the statutory language and the legislative purpose.

IH contends that it cannot be liable under § 1362 for the shortfall in WSC's pension plans. It was not the employer maintaining the plans at the time they were terminated; rather, WSC was. Applying the language of the statute literally, IH argues that a sale such as occurred here, where the former employer passes along pension plan maintenance to its successor without termination, insulates that former employer against any and all ERISA liability thereafter. The PBGC, IH claims, can only look to WSC for liability.

The PBGC's two essentially identical amended complaints each have four counts designed to meet that objection. It alleges, first, that IH remained an employer maintaining a pension plan within the meaning of § 1362 throughout the WSC period, either as the sole real employer (count II), or as a joint employer with WSC (count I). These counts would make IH responsible for all WSC pension obligations through the 1980 bankruptcy. Counts III and IV attempt to reach IH on the basis of the facts of the sale to WSC. In count III the PBGC asks this court, for purposes of § 1362 liability, to disregard the sale as a fraudulent transfer under the Illinois fraudulent conveyance statute, Ill.Rev.Stat. ch. 59, ¶ 4, thus reviving the claim the PBGC would have had against IH if there had been no sale. Count IV, as this court reads it, alternatively seeks to make IH liable at least for the shortfall on pension promises IH itself made through the time of the sale to WSC in July 1977. This count, loosely modeled on "sham transaction" principles from federal tax law, asks us to consider the sale an attempt to evade an obligation imposed by federal law, and to find IH liable under § 1362 as if the sale in 1977 had included a termination of the pension plans. IH, in its motion to dismiss, argues that none of these approaches has any basis in law.

## I. "Any Employer Who Maintained a ... Plan"

For counts I and II the PBGC contends that even after the sale, and until WSC ceased operations, IH continued to fit the category of an employer who maintained a plan. Thus IH became liable under § 1362 when the plans terminated. The PBGC points to ERISA's definition of "employer" at 29 U.S.C. § 1002(5):

> The term "employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity.

That definition sweeps so broadly that it could even include fiduciaries of a plan. IH does not deny that it acted as a fiduciary after the sale, controlling the pension trust funds. Therefore, according to the PBGC, IH is liable under § 1362 for the shortfall in the plans, either alone or jointly and severally with WSC.

IH responds that Congress could not have intended for full employer liability to fall on mere fiduciaries. It points out that § 1002 is introduced with the words, "For purposes of this subchapter". Section 1362 does not fall within subchapter I (also called Title I) of ERISA, the subchapter in which § 1002 is found, but rather within subchapter III (also called Title IV). Thus IH contends that the Title I definition does not apply in any respect to § 1362. Moreover, it would be demonstrably unfair to hold a fiduciary liable for a shortfall in contributions when it had no obligation to make contributions and no control over them.

Courts have been grappling with the meaning of "employer" under Title I and, for purposes of withdrawal liability, under Title IV, with conflicting results. An emerging consensus seems to be that employer liability for Title I purposes extends well beyond proof necessary to pierce the corporate veil, *Gambino v. Index Sales Corp.*, 673 F.Supp. 1450 (N.D.Ill.1987), but that the "employer" definition in Title I does not necessarily control resolution of

Title IV issues, at least with respect to withdrawal liability. *See Glover v. S.D.R. Cartage Company, Inc.*, —— F.Supp. ——, No. 86 C 4297 (N.D.Ill. March 1, 1988).

We do not believe that the Title I definition controls here or that mere fiduciaries are liable under § 1362. That does not, however, lead inevitably to the conclusion that a predecessor can be held liable only if plaintiff can "pierce the corporate veil."

■ Section 1362 does not apply to all Title I employers, but it does apply to all employers who *maintained a plan.* 29 U.S.C. § 1362(a) (1982) (emphasis added); *PBGC v. Ouimet Corp.,* 470 F.Supp. 945, 950 (D.Mass.1979), *aff'd,* 630 F.2d 4 (1st Cir.1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981). Although maintaining a plan is not defined in the statute, the choice of words suggests someone with more responsibility for decisions about contributions than a person who simply administers or takes care of the funds. The legislative history of ERISA indicates that Congress wanted liability to fall in the first instance on the employer who made the pension plan promises, unless that employer was insolvent. *Connolly,* 475 U.S. at 232, 106 S.Ct. at 1030 (O'Connor, J., concurring); *Nachman,* 592 F.2d at 963; *see, e.g.,* S.Rep. No. 127, *supra,* 1 Leg.Hist. 612, 630; S.Rep. No. 383, 93d Cong., 1st Sess., 1 Leg.Hist. 1155–56; H.R.Rep. No. 533, *supra,* 2 Leg.Hist. 2362, 2373. Thus the reported decisions on who may be liable under § 1362, or under the parallel provisions of the MPPAA, have primarily involved someone who had made contributions to a pension plan, usually as a result of having negotiated pension benefits with his employees or with a union. *Korea Shipping v. New York Shipping Ass'n.,* 663 F.Supp. 766, 769–770 (S.D.N.Y. 1987); *Matter of Uiterwyk Corp.,* 63 B.R. 264, 266 (M.D.Fla.1986); *Refined Sugars v. Local 807 Labor–Manag. Pen. Fund,* 632 F.Supp. 630, 632 (S.D.N.Y.1986). We note also that in the 1986 revision of § 1362 Congress changed the operative noun for persons liable from "employer" to "contributing sponsor." 29 U.S.C.A. § 1362(a) (West Supp.1987). Acting as a fiduciary or plan administrator is not enough, standing alone, for exposure to employer liability.

■ The statute does not, however, strictly limit employer liability to the entity which physically made pension contributions. The policy consideration is that liability should fall on all the persons or entities which share responsibility for pension promises. Therefore, the PBGC's claim reaches any entity which is fairly responsible for decisionmaking about the plan and the level of contributions to it. *See Ouimet,* 470 F.Supp. at 951; *PBGC v. Center City Motors, Inc.,* 609 F.Supp. 409, 412 (S.D.Cal.1984). When two or more entities are under common control the assets of all the members of the controlled group are exposed to § 1362 liability even though only one of them has actually contributed to the plan. 29 U.S.C. § 1301(b)(1); *PBGC v. Anthony Co.,* 537 F.Supp. 1048 (N.D.Ill. 1982). And the Title I definition of employer includes "a group or association ... acting for an employer". 29 U.S.C. § 1002(5). This policy consideration may apply here.

■ The PBGC does not allege that IH and WSC were formally under common control. It does, however, allege very close cooperation between them to the point of IH's domination over WSC. And the question here involves an obligation imposed by federal law. In such cases a court looks not just to the form of the legal arrangements but also to their substance—the realities beneath the form. *See, e.g., Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985); *Diedrich v. Commissioner,* 457 U.S. 191, 195–196, 102 S.Ct. 2414, 2417–18, 72 L.Ed.2d 777 (1982). Following that principle, courts regularly have imposed liability for actions contrary to federal policy not just on the immediately involved legal entity, but also on the persons or entities which shared responsibility for the action by controlling decisionmaking about that policy. *See, e.g., Alman v. Danin,* 801 F.2d 1 (1st Cir.1986) (ERISA violations); *Odriozola v. Superior Cosmetic Distributors, Inc.,* 531 F.Supp. 1070 (D.P.R.1982) (age discrimination). For example, if a person or corpora-

tion is misusing its privilege to create corporations by attempting to use corporate structures as a shield to circumvent the purposes of ERISA, a court may "pierce the corporate veil" to impose liability on shareholders or a parent corporation. *Connors v. P & M Coal Co.*, 801 F.2d 1373, 1378 (D.C.Cir.1986); *Baker v. Caravan Moving Corp.*, 561 F.Supp. 337, 340–41 (N.D.Ill.1983). Similarly, if a dissolution and sale of a business turns out to be a sham, a disguised continuance, to avoid liability for pension benefits negotiated under a collective bargaining agreement with the dissolved predecessor, a court may impose the predecessor's ERISA liability under that agreement on the successor. *Carpenters Local Union No. 1846 v. Pratt–Farnsworth, Inc.*, 690 F.2d 489, 526 (5th Cir.1982), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

■ Counts I and II state a claim along these lines. A court should not dismiss unless it appears that the plaintiff has no claim on any facts which could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). The PBGC alleges that IH loaned funds to WSC expressly for the purpose of enabling WSC to make pension contributions. With additional facts the PBGC might be able to show that even after the sale IH was the real decisionmaker in pension matters—that WSC engaged in pension negotiations and made pension contributions as the agent of IH. Alternatively, we note that one can have concurrent or joint employers for purposes of employer liability. *Central Pennsylvania Teamster's Pension Fund v. Service Group, Inc.*, 645 F.Supp. 996, 998 (E.D.Pa.1985). The PBGC might be able to show that looking at the substance of the arrangements between IH and WSC in 1980, they were joint venturers in maintaining the pension plans.

In either case, the real situation could sufficiently approximate the common control or association of which the statutes speak, so that as a matter of policy IH should be liable as an employer. If IH caused pension promises to be made

through 1980, then following the principle of substance over form it should be liable to the PBGC under § 1362 for those promises. *See, e.g., Center City*, 609 F.Supp. at 412–13 (same persons made decisions for both entities, so both entities liable); *Anthony*, 537 F.Supp. at 1052 n. 6 (realities of business operation should prevail for liability purposes over legal formalities). The claims seem difficult to prove, but difficulty of proof is not grounds for dismissal. IH's motion to dismiss is denied as to counts I and II.

## II. "At The Time It Was Terminated"

In counts III and IV the PBGC pursues an alternative approach based on the circumstances of the sale to WSC. Count III contends that the sale was a fraud on the PBGC as a contingent creditor of IH. Count IV alleges that a sale to such a weak buyer should not erase all ERISA liability for an entity which was the employer at Wisconsin Steel for the previous 75 years. Even if the PBGC cannot prove that IH was still an employer maintaining a plan in 1980, at least IH should be liable under § 1362 for the pension promises it made and the pension obligations it incurred up through the time of the sale to WSC in 1977. IH, it alleges, knew or should have known that the inevitable consequence of the sale to WSC would be a shifting of the pension obligations to the PBGC. WSC was severely undercapitalized and its management lacked steelmaking experience. A reasonable businessman would have known that in all probability it would fail; and when it failed, the $45 to $86 million in unfunded pension obligations would fall on the insurance program.

Under such circumstances, the PBGC argues, IH should still be liable for its own pension promises despite the sale. There is no dispute that IH was "an employer who maintained a plan" until July 31, 1977. If the plans had been terminated then, with the employees and WSC making fresh pension arrangements, which often occurs as a result of a sale, then IH would have been liable for the unfunded pension obligations up to that point. IH should not be able to evade those obligations through a sale to

such an obviously weak buyer. The phrase in § 1362(a), "at the time it was terminated," should not prevent the PBGC from collecting that amount of liability now.

IH maintains that given the statutory language, when a sale occurs without a corresponding termination of the pension plans the predecessor employer's ERISA liability ceases. Regardless of the predecessor's motive in making the sale, and regardless of the objective economic realities of the sale, no statutory authority exists, it says, for the PBGC to reach a predecessor employer. Since the statute speaks only of the employer at the time the plan was terminated, only the employer of the moment when the plan is terminated can be liable.

### A. Predecessor Liability Under § 1362

This court cannot hold that the PBGC's claims for liability must be so narrowly confined as IH contends. As the Supreme Court has said in another context, Congress did not intend that an employer should be able to defeat his ERISA liability merely with private contractual provisions. *Connolly,* 475 U.S. at 227, 106 S.Ct. at 1027. Yet IH's literal construction of the statute would produce precisely that result.

Consider, for example, the hypothetical situation in which an employer within the scope of ERISA wants to escape all ERISA liability for his pension promises. On IH's reading of § 1362, all that employer needs to do to achieve the goal is to convey his business to an insolvent nominee. If the successor agreed to assume the employer's pension plans and obligations, as he could willingly do, knowing that as an insolvent he would never actually have to make good on them, then the plans would not terminate at the time of the sale. Even if the nominee only operated the business for one day before going bankrupt, the employer would have no ERISA liability because he was not the employer at the time the pension plans were terminated. Instead, the PBGC's insurance fund—and so the other employers of America who pay ERISA premiums—would have to absorb all pension liability. Congress cannot have intended such a result.

Statutory construction begins with the words of the statute, of course, but it does not necessarily end there. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Interpretation of a statute is not a matter of simply looking at a few words or phrases in isolation. *Boys Market, Inc. v. Retail Clerks Union,* 398 U.S. 235, 250, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970); *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962). Rather, one construes particular statutory words and phrases against the background of the statute as a whole and its legislative purpose. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975); *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956). A court need not, and indeed cannot, adopt a literal reading of those particular words when such a reading leads to an absurd result on the facts before the court. *Turkette,* 452 U.S. at 580, 101 S.Ct. at 2527; *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *Smith v. Bowen,* 815 F.2d 1152, 1154 (7th Cir.1987).

Likewise, we cannot adopt a purely literal reading when that reading leads to a result which would thwart or undermine the obvious purpose of the statutory enactment. *Johnson v. Transportation Agency, Santa Clara County, California,* —— U.S. ——, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); *FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968); *FDIC v. Elefant,* 790 F.2d 661, 666 (7th Cir.1986); *Larimore v. Comptroller of the Currency,* 789 F.2d 1244, 1253 (7th Cir.1986). IH's literal reading would, if applied to certain kinds of sales, simply gut ERISA's employer liability provisions. Any employer could make any pension promises he wished, no matter how wildly unrealistic, knowing that all he need do to dump them onto the PBGC insurance program would be to find an

insolvent willing to sign a purchase contract. Every expression of congressional intent one can find in the legislative history would condemn that result. *E.g.,* S.Rep. No. 383, *supra,* 1 Leg.Hist. 1155–56 (liability provisions prevent employer from making unrealistic pension promises with the intent of shifting them to the insurance fund); H.R.Rep. No. 533, *supra,* 2 Leg. Hist. 2363 (provisions addressing corporate reorganization extend pension liability to solvent parent, preventing dumping of pension obligations onto insurance fund); Analysis of Amendments by Senate (submitted to senators at the time of amendment by Sen. Nelson), 2 Leg.Hist. 1723 (liability provisions keep solvent employers from taking advantage of the insurance plan).

IH nevertheless further argues that no predecessor liability exists under § 1362 by noting that Congress passed the following amendment to ERISA in 1986:

If a principal purpose of any person in entering into any transaction is to evade liability to which such person would be subject under this subtitle and the transaction becomes effective within five years before the termination date of the termination on which such liability would be based, then such person and the members of such person's controlled group ... shall be subject to liability under this subtitle in connection with such termination as if such person were a contributing sponsor of the terminated plan as of the termination date....

29 U.S.C. § 1369(a). The section expressly applies only to transactions with effective dates on or after January 1, 1986. If anyone other than an employer maintaining a plan at the time of termination could be liable under § 1362, IH argues, there would have been no need for this amendment.

The passage of § 1369, however, does not necessarily mean that predecessors were free from liability under ERISA until this amendment. Congress may codify or clarify existing law without performing a meaningless act. *United States v. Yancey,* 827 F.2d 83, 88 (7th Cir.1987); *Whalen*

*v. United States,* 826 F.2d 668, 670 (7th Cir.1987). For example, when Congress in 1982 amended the Commodities Exchange Act to provide for an express private right of action, 7 U.S.C. § 25, its enactment did not mean that the implied private right of action under § 6b had never existed. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 381, 102 S.Ct. 1825, 1840, 72 L.Ed.2d 182 (1982); *Evanston Bank v. ContiCommodity Services, Inc.,* 623 F.Supp. 1014, 1022 (N.D.Ill. 1985). Indeed, the addition of § 1369 would ordinarily be just as likely to provide support for the position that the former § 1362 includes some predecessor liability. Where the circumstances indicate that Congress was clarifying existing law, then the clarifying amendment provides strong evidence about the original legislative intent for the section being clarified. *Yancey,* 827 F.2d at 88; *Whalen,* 826 F.2d at 670; *see Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969).

The legislative history of § 1369 provides some reason to believe that it was a clarifying amendment. The relevant committee report from the House of Representatives, where the provision originated, describes it as such. In the committee's opinion predecessor liability had always existed under ERISA when the transaction at issue was an attempt to evade ERISA liability. Section 1362 provided for assessment of full liability against a predecessor employer if he transferred unfunded pension benefits to an entity which did not have a reasonable chance of paying for those benefits. The committee reasoned that an express statutory provision would, however, avoid litigation over the question. H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 2 (1985), *reprinted in* 3 1986 U.S.Code Cong. & Admin.News 42, 690–91, 713–14.

As IH points out, the Conference Committee was less clear about the state of the existing law. It added the provision making § 1369 effective only after January 1, 1986, and said, "The conferees intend that no inference is to be drawn from these provisions with respect to the application of present law to such transactions." H.R.

Rep. No. 453, 99th Cong., 1st Sess., at 592 (1985) (IH's exh. 19). But that statement does not require us to conclude that the 99th Congress as a whole, or even the Conference Committee, believed that no predecessor liability whatsoever existed under ERISA until 1986. The conferees could have been concerned about incorporating specific parts of § 1369 into § 1362 liability, such as making an employer liable not only for his own promises but also for up to five years' worth of his successor's promises. And in any case, the "no inference" statement is not a clear rejection of the whole principle of predecessor liability. It more closely resembles a statement of "no comment" about the prior law. At most, "no inference" means that the interpretation of the former § 1362 for transactions before 1986 is left to the courts, using ordinary principles of statutory construction, with the new § 1369 being neither evidence for nor evidence against the existence of predecessor liability.

IH further points out that bills which included provisions which would have expressly imposed predecessor liability were submitted on several occasions prior to 1986, some sponsored by the PBGC, and Congress did not act on them. To IH that fact constitutes more evidence that no predecessor liability existed until 1986. But IH's purported evidence ignores an important principle of statutory construction. Congressional inaction is not ordinarily construed as disapproval or rejection, not even when Congress fails to act on an amendment sponsored by a government agency. *Curran,* 456 U.S. at 387, 102 S.Ct. at 1843; *American Trucking Ass'n v. Atchison, Topeka & Santa Fe Railway,* 387 U.S. 397, 418, 87 S.Ct. 1608, 1619, 18 L.Ed.2d 847 (1967). That principle remains true even when Congress eventually passes legislation on the same issue. *Curran,* 456 U.S. at 387, 102 S.Ct. at 1843. Neither Congress' failure to pass a specific predecessor liability provision before 1986 nor its passage of § 1369 in 1986 requires a conclusion that § 1362 does not incorporate some predecessor liability.

This court therefore will apply ordinary principles of statutory construction to § 1362. If a literal application of the words of a statute produces results strongly at odds with the apparent legislative purpose, a court must turn to the legislative history to see if that result was intended. *Fred Meyer,* 390 U.S. at 349, 88 S.Ct. at 908; *American Trucking,* 310 U.S. at 544, 60 S.Ct. at 1064; *Smith,* 815 F.2d at 1155. Here the result of a literal reading is that a solvent employer could sluff off his pension obligations to the insurance fund. That result is certainly at odds with the purpose of the ERISA insurance program, at least as other courts have perceived it. As both the Supreme Court and the Seventh Circuit have determined, a major purpose of ERISA was to force solvent employers to make good on the pension promises they had made and for which they had already received the full benefit of their bargain. *Nachman,* 446 U.S. at 378–381 and nn. 28 & 32, 100 S.Ct. at 1734–36 and nn. 28 & 32; 592 F.2d at 957 nn. 19 & 20, 962; *see also A–T–O, Inc. v. PBGC,* 634 F.2d 1013, 1026 (6th Cir.1980). Under no circumstances did Congress intend ERISA to serve as a vehicle through which solvent employers could avoid their pension obligations by shifting them to the PBGC, and so to the other employers of America who pay ERISA premiums. *Nachman,* 446 U.S. at 379–80 n. 30, 100 S.Ct. at 1735–36 n. 30; 592 F.2d at 957 & n. 18, 963; *see also PBGC v. Ouimet Corp.,* 711 F.2d 1085, 1092 (1st Cir.), *cert. denied,* 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983); *Solar v. PBGC,* 504 F.Supp. 1116, 1120 (S.D.N.Y.), *aff'd mem.,* 666 F.2d 28 (2d Cir.1981).

We therefore turn to the legislative history to see if Congress intended that result. Unfortunately, the history of § 1362's eventual language is murky. The employer liability provision in the version of the legislation passed by the House and the version which was reported out of the Senate Committee on Labor and Public Welfare to the Senate floor apparently provided for joint and several liability in the case of a sale—*i.e.,* either the predecessor or the successor would be liable on presale promises. In that version liability extended to an employer who had contributed to a

terminating plan *or* that employer's successor in interest. H.R. 2, 93d Cong., 1st Sess., 3 Leg.Hist. 4038; S.4, 93d Cong., 1st Sess., 1 Leg.Hist. 538 (emphasis added). The House and the Senate Labor Committee apparently were following the common law of contracts and subrogation. Under basic contract law, of course, the predecessor's delegation of performance of the pension plan promises to his successor would not bar a claim against him from his employees on those promises. *Restatement (Second) of the Law of Contracts,* § 318 (1981); *see, e.g., Local 82, United Packinghouse, Food and Allied Workers v. United States Cold Storage Corp.,* 430 F.2d 70, 73 (7th Cir.1970) (after sale of business, workers retain contract rights against predecessor under collective bargaining agreement). The PBGC, as an insurer, then would be subrogated to those employee claims, *Restatement of the Law of Restitution,* §§ 76, 162 (1937), and so would have a claim against the predecessor as well as the successor. The relevant committee reports, at least, indicate that the drafters of this version had something of the sort in mind. *See* S.Rep. No. 127, *supra,* 1 Leg. Hist. 630; H.R.Rep. No. 533, *supra,* 2 Leg. Hist. 2373.

The full Congress, however, never passed those joint and several liability provisions. In a Senate compromise reached in some haste, the bill as reported from the Labor Committee to the full Senate was amended on the floor by widespread adoptions from the text of another bill, S. 1179, reported out of the Finance Committee. 2 Leg.Hist. 1580–81, 1590–91. The liability provision for single-employer plans was one of those adoptions, and the conference committee adopted the Senate language. *See* 1 Leg.Hist. 932, 2 Leg.Hist. 1396–98, 3 Leg.Hist. 4642–43. The senators must have intended to give some protection to predecessors by making the change. Full predecessor liability was, apparently, before the senators in the provisions of the Labor Committee bill. But nothing in the legislative history directly addresses the amendment which gave us the present language, "at the time it was terminated." The only reason given for the switch in

employer liability provisions was a desire to reduce the maximum possible employer liability from the 50% of net worth figure in the bill passed by the House and the bill reported out of the Senate Labor Committee to a cap of 30% of net worth. 2 Leg. Hist. 1629 (Sen. Nelson), 1724–26 (Senate analysis); 3 Leg.Hist. 4642–43, 5220–22 (Conference Committee reports).

IH contends that the new language meant absolute protection for predecessors regardless of the circumstances. But that construction, as we have seen, has the potential to completely undermine the provision for employer liability. To borrow a phrase from the Supreme Court, we cannot adopt that construction "in the absence of an unmistakable directive" from Congress that it intended that result. *Fred Meyer,* 390 U.S. at 349, 88 S.Ct. at 908. No such directive exists. Indeed, the legislative history of ERISA is rife with statements denouncing abuse of the insurance program by solvent employers. 1 Leg.Hist. 612, 1156; 2 Leg.Hist. 1724–26, 2363, 2372; 3 Leg.Hist. 3530, 4678, 4741–42, 4759, 4767, 4781.

Moreover, such statements appear both during the process of amendment and after it. For example, the Senate analysis of the employer liability provisions in the compromise bill, submitted to senators at the time of the amendments by Sen. Nelson, expressly said: "Employers are required, when they are solvent, to reimburse the insurance fund for its losses, up to certain limits, as a precaution to prevent employers from terminating plans to take advantage of the insurance." 2 Leg.Hist. 1723. And after the change in language, just as before it, the legislators continued to say that solvent employers would not be able to dump their pension obligations onto the insurance program. Rather, the PBGC would be able to collect from such employers through the employer liability provisions. *See, e.g.,* 2 Leg.Hist. 1723–24 (Senate analysis); 3 Leg.Hist. 3530 (remarks of Rep. Anderson), 4678 (Rep. Ullman), 4741 (Sen. Williams), 4781 (Sen. Long). Congress therefore cannot have intended to protect predecessors from liability in situa-

tions where the result would be abuse of the insurance program. Like the *A–T–O* court, we read the legislative history to say that Congress had some concern for employers, but only for those facing significant economic hardship; otherwise, a solvent employer was expected to bear the costs of the pensions he had promised. 634 F.2d at 1021, 1026. We need no inference from the passage of § 1369 to determine that IH's literal reading of § 1362 cannot be the right application of that statute to this case.

This court concludes that the situation which the PBGC alleges here, delegation of ERISA responsibilities through a sale to an entity incapable of meeting those responsibilities, is one which Congress simply did not anticipate when it drafted the statutory language. The comments in the Senate analysis on what became § 1362, presumably prepared by the section's drafters, indicates that they assumed that most sales of a business would lead to termination. 2 Leg.Hist. 1723–24. The drafters of the language in all probability did not anticipate that a sale of a firm could be accomplished without a termination of the firm's pension plans, except to a solvent successor. As the Seventh Circuit stated in an analogous circumstance, "[w]e do not want to create an unintended loophole in the Act by a literal-minded application of [the statute] to a situation not foreseen when the statute was [passed]." *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175 (7th Cir.1987). In such a circumstance, resolution of the question of how to apply the statute is simply left to the courts. *Id.* Gaps in the insurance subtitle of ERISA exist and must be filled in the ways that are most consistent with the purposes of that subtitle. *Heppenstall*, 633 F.2d at 297 (method of selecting a date of termination when disputed); *cf. Robbins v. McNicholas Transportation Co.*, 819 F.2d 682, 685 (7th Cir.1987) (factors to be considered before ordering interim payments during arbitration of dispute over MPPAA withdrawal liability). The failure of the drafters to anticipate the type of sale alleged here is a gap which must be filled in the same manner. We therefore hold that when an employer sells his business under circumstances which would constitute abuse of the insurance program he is liable under 29 U.S.C. § 1362 (1985).

## B. Fraudulent Conveyance

We now turn to the task of discerning what theory of recovery will fill the gap. In count III the PBGC seeks to reach IH by characterizing the sale to WSC as a fraudulent conveyance under Ill.Rev. Stat. ch. 59, ¶ 4, and so void as to the PBGC as a continent creditor of IH. IH counterattacks by arguing that ERISA's provisions, being federal law, preempt any state statute, including the fraudulent conveyance statute, as soon as it touches the operation of a pension plan. *See* 29 U.S.C. § 1144(a). It also argues that the fraudulent conveyance statute does not fit these facts.

This court does not believe that Congress intended to preempt state fraudulent transfer law from applying to a PBGC claim for employer liability. Consider a hypothetical situation where an employer, just before termination of his pension plan, conveys all his assets to a nominee for $1, leaving himself with a net worth of $100. If the PBGC could not take advantage of fraudulent conveyance principles its claim against this employer would be limited to $30, 30% of his net worth. For the reasons set forth above, Congress cannot have intended for employers to be able to escape liability so easily. In that situation the PBGC would be able to reach the employer's assets in the hands of the nominee.

We agree, however, that fraudulent conveyance principles simply do not apply to this case. IH did not convey its assets to a party against whom the PBGC has no claim, leaving itself insolvent. The PBGC has a perfectly sound § 1362 claim against WSC, but here WSC is the insolvent. IH still has the assets which the PBGC wants to reach. The fraudulent conveyance statute is not preempted, but it does not provide a means of making IH liable under § 1362. Count III is dismissed.

## C. Implying a Termination From Objective Economic Realities

The question here is rather one of interpretation and application of the language of § 1362. When a court concludes that it is dealing with a situation which Congress did not foresee, it must search for an interpretation and application which can reasonably fit both the statutory language and congressional intent as expressed in the legislative history, and which can also carry out the statute's purposes. *American Trucking*, 310 U.S. at 544, 60 S.Ct. at 1064; *Mechmet*, 825 F.2d at 1177; *In re McVey Trucking, Inc.*, 812 F.2d 311, 323, 825 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 227, 98 L.Ed.2d 186 (1987).

We cannot, for instance, just read the new § 1369(a) into the old § 1362, and not only because § 1369 is not retroactive. All its details cannot be reconciled with § 1362's language. For example, it imposes liability for up to five years after a transaction when a "principal purpose" of the transaction was an attempt to avoid ERISA liability. In other words, a predecessor apparently could be liable under § 1369 not only for the obligations he incurred while he owned the business, but also for the obligations his successor incurred during the five years following the sale, regardless of the economic prospects of the successor at the time of sale. We find no basis for such an expansion of a predecessor's liability in § 1362. Section 1369 also supplies a bright-line durational "safe harbor" for employers. It provides that a predecessor's exposure to liability ends if the plan survives for five years after the sale. No doubt there would be some time limit to exposure under § 1362, but the statute contains no bright-line rule.

The gap can be closed, however, by drawing once more on the principle of substance over form. Under that principle the law would recognize an implied-in-fact termination of a plan when a solvent employer sells to a weak buyer. When the issue is escaping an obligation imposed by federal law, a court looks to the substance of a transaction rather than the labels the parties applied to it, *Diedrich*, 457 U.S. at 195,

102 S.Ct. at 2417; *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 851–52, 95 S.Ct. 2051, 2059–60, 44 L.Ed.2d 621 (1975). Therefore, a termination may have in fact occurred even though the parties did not call it one. When an employer delegates his duties toward a pension plan with substantial unfunded liabilities to a buyer who economically has little chance to succeed, then realistically that plan has been terminated. In medical language that plan is terminally ill; it may linger for a while before death, but absent a miracle its fate is determined. It will end up as the PBGC's responsibility, and a drain on the insurance fund, unless a solvent employer can be made liable for the underfunding. Calling that type of sale a termination which triggers employer liability to the PBGC for obligations incurred up to that point reasonably fits both the statutory language and congressional intent and serves the purposes of the statute.

IH, perhaps anticipating this line of reasoning, argues in the alternative that it cannot be held liable to the PBGC unless it subjectively believed that its successor was so weak that it would be unable to cover the unfunded benefits, throwing them back onto the insurance fund. But the subjective feelings of a party attempting to evade a federal obligation have never been a part of the substance-over-form approach. *See Diedrich*, 457 U.S. at 197, 102 S.Ct. at 2418; *Slappey Drive Industrial Park v. United States*, 561 F.2d 572, 583 (5th Cir.1977); *Estate of Mixon v. United States*, 464 F.2d 394, 407 (5th Cir.1972). Rather, the objective economic realities have determined the legal characterization of the transaction. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978); *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir.1968). IH's approach would mean that a court could not characterize any sale as an implied-in-fact termination where the employer thought that the buyer had a reasonable chance to succeed, no matter how objectively weak the buyer was. Such limits on liability would scarce-

ly serve the purposes of ERISA. Parties are often liable when liability follows from their conduct under the factual circumstances, objectively determined, regardless of what they subjectively thought. *Slappey Drive*, 561 F.2d at 583, 585; *Fin Hay*, 398 F.2d at 697; *see also* Restatement of Contracts, *supra*, § 4 and comments (implied-in-fact contracts). When an employer transfers the obligations for unfunded pension benefits to a buyer who, objectively, does not have a reasonable chance of paying for those benefits, such a transfer is an implied termination for purposes of § 1362 liability.

### D. Intent to Evade Pension Obligations

The legislative history of ERISA, however, requires us to conclude that such a transfer is not the only requirement for predecessor liability under § 1362. To be liable an employer must also have intended to evade his ERISA obligations.

The PBGC argues for a wholly objective standard for abuse of the insurance program through sale of a business. If a reasonably informed employer would have known that the entity to which he delegated the responsibility for his unfunded pension benefits did not have a reasonable chance of paying for them, then he should be liable to the PBGC regardless of whether or not he intended to evade his pension obligations.

A standard which sweeps that broadly cannot be reconciled with either the statutory language or the legislative history. It takes an application of the principle of substance over form to bring the PBGC's allegations within the statutory language. That principle is most frequently invoked when the facts raise a question of intent to avoid a federal obligation. *See, e.g., Frank Lyon*, 435 U.S. at 584, 98 S.Ct. at 1304; *Knetsch v. United States*, 364 U.S. 361, 365–366, 81 S.Ct. 132, 134–35, 5 L.Ed.2d 128 (1960); *United States v. Philatelic Leasing, Ltd.*, 794 F.2d 781, 786 (2d Cir. 1986); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91–92 (4th Cir. 1986). More importantly, Congress intended to give a substantial degree of protec-

tion to predecessors. A requirement that intent to evade the obligation be shown preserves that protection. What is denounced in the legislative history of ERISA is intentional abuse of the insurance program: for example, making promises to win labor peace that the employer had no intention of keeping, but rather leaving them to the insurance fund, S.Rep. No. 383, *supra*, 1 Leg.Hist. 1156, fractionalizing operations into several corporations in an attempt to put assets beyond the PBGC's reach, *id.* at 1156; H.R.Rep. No. 533, *supra*, 2 Leg.Hist. 2363; making terminations that were actually disguised continuances, *id.* at 2363; S.Rep. No. 383, *supra*, 1 Leg.Hist. 1156; Senate Analysis, *supra*, 2 Leg.Hist. 1724. A reasonable interpretation of § 1362 in the light of the legislative history, then, is that Congress was willing to allow a sale of the business which did not include a termination of its pension plans to end an employer's exposure to ERISA liability unless the sale was intended as a device to evade pension obligations.

Such intent need not, of course, be the only motive for the transaction. For this element the language presently found in § 1369(a) reasonably reflects the policy goals of the Congress which passed ERISA, and is probably what the 93d Congress would have enacted if it had foreseen these situations. We conclude that a predecessor is exposed to liability under the former § 1362 if a principal purpose of the transaction which made him a predecessor is to evade liability imposed by ERISA.

■ This court holds, then, that predecessor liability under the former § 1362 requires proof of two elements, one subjective and one objective. An employer who, with a sale of his business, delegates his pension obligations is liable if a principal purpose of the sale is to evade pension liability and if, objectively, his buyer lacks a reasonable chance of meeting those obligations.

Our holding dovetails with the Conference Committee's "no inference" statement because § 1369 did reduce the extent of protection for predecessor employers. Take the case of an employer who intends

to evade his pension obligations but to whom it is all the same whether the PBGC or his successor picks them up. He sells his business to, and delegates the obligations to, a Fortune 500 company with every likelihood of success in the business. A sale to a viable buyer is not an abuse of the *insurance program*, and would not constitute an implied-in-fact termination under § 1362. If, contrary to all expectations, three years later the buyer goes bankrupt and the plan terminates, the predecessor employer would not be liable. Under the new § 1369, however, as we read it, that employer would be liable to the PBGC. He intended to evade his obligations and the plan terminated within five years after the transaction.

The foregoing situation, however, is not what the PBGC alleges. It contends that IH sold Wisconsin Steel to WSC in part to insulate itself from ERISA liability for unfunded pension obligations, and that it either knew or should have known, on the basis of WSC's lack of both capital and experience in steel-making, that in all probability WSC would fail. Those allegations state a claim against IH under § 1362 for pension obligations incurred up to the time of the sale. IH's motion to dismiss count IV is denied.

### CONCLUSION

Defendant International Harvester Company's motion to dismiss the Pension Benefit Guaranty Corporation's amended complaints against it is granted as to count III in both complaints, but is otherwise denied.