**TEAMSTERS PENSION TRUST FUND OF PHILADELPHIA AND VICINITY, a multiemployer employee pension benefit plan, Charles J. Schaffer, Jr., a fiduciary, Plaintiffs–Appellants,**

v.

**CENTRAL MICHIGAN TRUCKING, INC., a Michigan corporation; Coast–To–Coast Transportation, Inc., a Michigan corporation; Transportation and Business Systems, Inc., a Michigan corporation; and Fuqua Industries, Inc., a Delaware corporation, Defendants–Appellees.**

No. 87–2023.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 12, 1988.

Decided Sept. 28, 1988.

Thomas W. Jennings, Sanford G. Rosenthal, Sagot & Jennings, Philadelphia, Pa., Theodore Sachs (argued), Andrew Nickelhoff, Detroit, Mich., for plaintiffs-appellants.

Jacob M. Yellin, John Ohlweiler, Simpson, Thacher & Bartlett, New York City, Kenneth Edgar, Jr. (argued), Thomas P. Hogan, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, Mich., for defendants-appellees.

Before KENNEDY and WELLFORD, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

WELLFORD, Circuit Judge.

This appeal presents an interesting and complex issue of statutory interpretation regarding a predecessor employer's withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.* The district court held that following a change in corporate structure that is not a sham and that does

---

not incur contemporaneous withdrawal liability, the predecessor employer cannot be assessed withdrawal liability for the subsequent withdrawal or failure of the successor employer.

The material facts are not disputed. Interstate Motor Freight Systems, Inc. ("Interstate"), incorporated in Michigan in 1932, was, until its bankruptcy in 1984, a common carrier providing trucking services. In 1968, defendant-appellee Fuqua Industries, Inc. ("Fuqua"), acquired one hundred percent of Interstate's outstanding common stock. Fuqua held Interstate as a wholly owned subsidiary from September 1968 to November 1, 1980. On September 29, 1980, Fuqua's Board of Directors authorized the distribution of Interstate common stock to Fuqua common stock holders. This distribution, commonly known as a stock "spin-off," became effective as of November 1, 1980. Interstate thus became an independent, publicly held corporation.

During the period of Fuqua's ownership of Interstate, the latter was obligated under collective bargaining agreements to make contributions on behalf of certain of its employees to plaintiff-appellant Teamsters Pension Trust Fund of Philadelphia and Vicinity ("the Fund"). Interstate's obligation continued after the spin-off, and Interstate continued to make uninterrupted contributions until December 11, 1984, when Interstate ceased operations due to serious financial problems.[1]

In early 1985, the Fund assessed withdrawal liability pursuant to 29 U.S.C. §§ 1381 and 1399 against Interstate, on the grounds that Interstate had completely ceased contributions to the Fund. The Fund also assessed Fuqua for that portion of the withdrawal liability attributable to the pre–1980 period of Fuqua's and Interstate's common control, and this latter assessment is at issue on appeal. Fuqua

requested the Fund to review the factual and legal bases of the assessment, and in April 1986, the Fund reasserted its original assessment of withdrawal liability.

In July 1985, the Fund commenced this action in district court against Fuqua,[2] alleging that, as a matter of law, Fuqua was liable to the Fund for payment of that portion of Interstate's withdrawal liability attributable to the pre-spin-off period (1968–1980) when Fuqua and Interstate were under common control. The second count alleged that the 1980 spin-off had as its "principal purpose" the evasion or avoidance of withdrawal liability under 29 U.S.C. § 1392(c). This second issue is now under submission to an arbitrator.

Following Fuqua's answer, the Fund moved for partial summary judgment on the first count, and for remand to statutory arbitration as to the second. Fuqua moved for summary judgment as to both counts. The district court granted summary judgment for Fuqua on the first count, and remanded count two for arbitration.[3] The district court concluded that the statutory language of ERISA/MPPAA does not provide for the subsequent imposition of withdrawal liability on a predecessor employer following a successful change in corporate structure that was accomplished without triggering contemporaneous withdrawal liability, *i.e.*, where payments were continued after the change. Here the Fund contends that withdrawal liability must be imposed on Fuqua at the subsequent time when Interstate, the successor employer, has withdrawn from the plan. The Fund therefore appeals the district court's adverse judgment.

The district court succinctly stated the issue presented to it and now to this court on appeal:

It is plaintiffs' contention that to remain consistent with the spirit of

---

**1.** Interstate filed a petition seeking Chapter 11 reorganization under the Bankruptcy Code on April 11, 1984. On December 28, 1984, this proceeding was converted to a liquidation proceeding.

**2.** The complaint also named as defendants three other corporations that were either subsidiaries

of or related to Interstate. All three are now insolvent and defunct, and none of the three responded to the Fund's complaint.

**3.** The issue remanded for arbitration is not before us on appeal.

MPPAA, any business which was an employer or member of a control group as defined under the Act must be held accountable for a contingent withdrawal liability for the time period during which it was an employer or member of the control group. Plaintiffs suggest that this "accrued" withdrawal liability does not become payable immediately upon a change of corporate structure, rather it is deferred as long as the new corporate entity contributes to the pension plan.

It is not disputed that Fuqua's 1980 spin-off of Interstate stock as a dividend to Fuqua's shareholders was a "change in corporate structure" under 29 U.S.C. § 1398.[4] We agree with the analysis of the statute, as it is read in conjunction with other pertinent provisions of ERISA and MPPAA, set out by Judge Miles in his opinion and order dated September 21, 1987. After the "change in corporate structure" involved, Interstate did assume the "original employer" position previously held by Fuqua, of which parent concern it was a wholly owned subsidiary prior to 1980. We therefore affirm the conclusion reached by the district court:

> Terming the spun-off company [Interstate] as the "original employer" clearly shows that under MPPAA the new employment entity will be deemed the original employer, consequently only that employer and any control group to which it belongs at the time of withdrawal will be responsible for withdrawal liability.

We find Judge Miles' reasoning persuasive in his additional conclusion that 29 U.S.C. § 1392(c)[5] was envisioned by Congress as the principal means of preventing an unscrupulous employer from dumping a distressed subsidiary in order to evade or avoid liability under the statutory scheme. Whether or not Fuqua acted with such a motive is a question now before an arbitrator, and we, of course, offer no opinion on that question.

Finally, we agree with the district court's further views after analysis of the statutory scheme as a whole:

> There is no congressional mandate to engage in legal gymnastics in order to guarantee pension plans at all costs. The courts have declined to impose withdrawal liability on corporate officers and shareholders by piercing the corporate veil. *Connors v. P & M Coal Co.*, 801 F.2d 1373 (D.C.Cir.1986); *Solomon v. Klein*, 770 F.2d 352 (3rd Cir.1985); or to apply the statute in a nonsensical fashion in order to assure full payment of withdrawal liability. *In re Challenge Stamping and Porcelain Co.*, 719 F.2d 146 (6th Cir.1983).

We affirm, then, generally for the reasons set forth fully in the district court's opinion and based on the authority relied upon therein. We address, however, several additional contentions raised on appeal.

The legislative history of MPPAA supports the conclusion that the common control group "employer" ceases to exist when a parent corporation sells the stock of a wholly owned subsidiary:

> [I]f P Corporation owns 100 percent of the stock of S Corporation, a subsidiary that has an obligation to contribute to a multiemployer plan on behalf of its employees, the controlled group consisting of P and S would be considered an employer with an obligation to contribute to

---

**4.** The pertinent parts of 29 U.S.C. § 1398 provide:

> Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—
> (1) an employer ceases to exist by reason of—
> (A) a change in corporate structure described in section 1362(d) of this title, or
> (B) a change to an unincorporated form of business enterprise,
> if the change causes no interruption in employer contributions or obligations to contribute under the plan, ...

For purposes of this part, a successor or parent corporation or other entity resulting from any such change shall be considered the original employer.

**5.** 29 U.S.C. § 1392(c) provides:

> If a principal purpose of any transaction is to evade or avoid liability under this part, this part [regarding employer withdrawals] shall be applied (and liability shall be determined and collected) without regard to such transaction.

the plan. *If P sells all of its interest in S to an unrelated party, the controlled group consisting of P and S would cease to exist.* However, if S continues to have an obligation to contribute to the plan, no withdrawal would be considered to have taken place merely because of the change in ownership of S.

H.R.Rep. No. 96–869, Part II, 96th Cong., 2d Sess. 16 (1980), *reprinted in 1980 U.S. Code Cong. & Admin.News* 3005–06 (emphasis added). To the same effect, see Pension Benefit Guaranty Corporation Opinion # 85–29 (December 5, 1985).

The Fund characterizes Fuqua's and the district court's reading of § 1398 as overly restrictive and asserts that because MPPAA does not expressly cut off the withdrawal liability of a member of a former control group "employer" upon a change in corporate structure, the liability survives in a contingent form. The Fund reasons that this result comports with the congressional concerns regarding employer withdrawal that prompted MPPAA's enactment. The Fund specifically relies on language in a Senate Labor Committee report on MPPAA:

> The Committee intends that the term "employer" be further construed in a manner consistent with the bill and so as not to impose withdrawal liability for changes in the form of an employer *if the plan is adequately protected against reductions in its contribution base and impairment of its ability to collect contributions or withdrawal liability.*

*Summary and Analysis of S. 1076* (S. Labor Comm.), *reprinted in* 310 Pens.Rep. (BNA) Special Supplement 81, 82 (Sept. 29, 1980) (emphasis added). Fuqua counters, however, by claiming that its position is equally consistent with this statement of congressional concern because under § 1398 withdrawal will occur and withdrawal liability will be assessed upon a change in the corporate structure of a control group employer *unless* plan contributions continue uninterrupted following the

change. Fuqua thus asserts that § 1398 expressly and adequately protects a plan's integrity without implying the continued contingent liability of a predecessor employer.

In addition to its argument that § 1398 supports its theory of a predecessor employer's accrued contingent withdrawal liability that becomes due when the successor employer withdraws from the plan, the Fund contends that the concept of accruing withdrawal liability finds support in ERISA's statutory methodology for calculating withdrawal liability, in case law, and in the tax code and Treasury regulations regarding the accrual of tax liability for control group corporations. According to the Fund, the "presumptive method" of calculating withdrawal liability provided by 29 U.S.C. § 1391(b)(1) measures withdrawal liability in terms of annual changes in the plan's unfunded vested liabilities and amortizes each annual segment over a twenty-year period. Thus, the Fund likens withdrawal liability to a debt that arises in annual increments and attaches to each business under common control with the contributing business during that year. As a result, the Fund would have us conclude that when common control is severed, each business in the group carries with it a contingent liability. The cases cited by the Fund in support of its contentions all arose in the context of bankruptcy proceedings and involved determinations as to whether withdrawal liability, as an indebtedness arising from ERISA/MPPAA, was to be characterized as an administrative expense.[6] We find these contentions to be unpersuasive, and the case authority not to be controlling on the question before us.

Finally, the Fund argues that the control group tax liability attribution provisions of the Internal Revenue Code support an accrual theory of withdrawal liability because ERISA/MPPAA and the Internal Revenue Code are *in pari materia* and should be interpreted consistently. In addition, ERISA's provision setting forth the control

---

6. *See Trustees of Amalgamated Insurance Fund v. McFarlin's, Inc.,* 789 F.2d 98, 103–04 (2d Cir. 1986); *In re Pulaski Highway Express, Inc.,* 57 B.R. 502, 507 (Bankr.M.D.Tenn.1986); *In re Kessler, Inc.,* 23 B.R. 722, 725–26 (Bankr.S.D.N.Y. 1982), *aff'd,* 55 B.R. 735 (S.D.N.Y.1985).

group employer concept expressly states that implementing regulations be "consistent and coextensive with" Treasury regulations promulgated under 26 U.S.C. § 414(c), the tax code's control group provision, 29 U.S.C. § 1301(b)(1). The Fund points to Treasury regulations under which the termination of common control does not relieve an affiliate of a control group of liability for the group's entire tax arising during affiliation. *See* 26 C.F.R. §§ 1.1502–6(b), 1.1502–77(b). In addition, the Fund asserts that treating Fuqua as subject to contingent withdrawal liability after the 1980 spin-off parallels the comparable tax treatment of a spin-off transaction under 26 U.S.C. § 355, which treats the resulting entities as a continuation of the former entity.

Again, we find that the Fund's comparison of ERISA/MPPAA's successorship rules to the Internal Revenue Code's successorship rules is not persuasive. MPPAA expressly incorporates the Internal Revenue Code's control-group provisions only to the extent that they define a control group of corporations. 29 U.S.C. § 1301(b)(1). If Congress had intended to engraft onto the pension statute the tax provisions regarding successorship following the termination of common control, it could have expressly done so. *See United Food and Commercial Workers Union v. Progressive Supermarkets*, 644 F.Supp. 633, 638 (D.N.J.1986). Absent such an express provision, tax precepts governing successorship are not dispositive of the meaning of MPPAA's successorship provision. *Cf. United Steelworkers v. Harris & Sons Steel Co.*, 706 F.2d 1289, 1298–99 (3d Cir.1983).

In sum, a critical review of the Fund's arguments that Fuqua accrued contingent withdrawal liability prior to the 1980 spin-off, which liability was triggered upon Interstate's withdrawal from the plan four years later, demonstrates the inherent weakness of the arguments: they fail to show that Congress *intended* a member of a control group employer to remain contingently liable for the withdrawal of a successor employer well after the successful accomplishment of a change in corporate structure pursuant to 29 U.S.C. § 1398. Absent a showing of such congressional intent, there is no reason to infer such liability in the absence of express statutory indications. In ERISA/MPPAA, Congress provided a comprehensive set of rules governing pension benefits and employer liability; we should apply the statutory language, not create new rules nor apply additional liabilities. *See Central States, Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co.*, 788 F.2d 428, 433 (7th Cir.1986).

We believe that *Banner Industries, Inc. v. Central States, Southeast and Southwest Areas Pension Fund*, 657 F.Supp. 875 (N.D.Ill.1987) and *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel*, 681 F.Supp. 512, 526 (N.D.Ill.1988), although not entirely analogous, support the principles expressed by the district court and those adopted herein. Also consistent with our conclusion is *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306 (5th Cir.1988):

> Although it is true that withdrawal liability is calculated according to the pension plan's pre-existing unfunded vested liability, that unfunded vested liability does not completely define or determine withdrawal liability. ERISA does not impose withdrawal liability on every employer that belongs to a pension plan that has an unfunded vested liability.
>
> .    .    .    .    .
>
> ... The argument that withdrawal liability is merely a method of imposing an already determined unfunded vested liability is conceptually faulty and unsupported by the case law.

*Id.* at 310, 313. Our decision gives due consideration to the Fund's assessment of withdrawal liability against Fuqua, but we do not find the Fund's reliance on Treasury regulations to be controlling here. (They may be pertinent to the definition of common control employers, under 29 U.S.C. § 1301(b)(1), but not to the existence or cessation of withdrawal liability of such an employer). What is here involved is a mat-

ter of statutory interpretation, and therefore we are not required to give a deferential view to the Fund's statutory construction, a matter properly for the courts to decide. By contrast, we defer to the Fund's assessment when it is implementing a particular plan's provisions or determining benefits under the plan's requirements. *See, e.g., Moore v. Reynolds Metals Co. Retirement Program,* 740 F.2d 454, 457 (6th Cir.1984), *cert. denied,* 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985).

For the reasons given by the district court and for the additional reasons set out herein, we affirm the judgment denying the Fund's assessment of withdrawal liability against Fuqua under Count I.