Kostas **MECHMET**, et al.,
**Plaintiffs-Appellants,**

v.

**FOUR SEASONS HOTELS, LIMITED,**
et al., **Defendants-Appellees.**

No. 86–2151.

United States Court of Appeals,
Seventh Circuit.

Argued April 15, 1987.

Decided Aug. 4, 1987.

procedure could well have affected the out- come.

Abigail K. Spreyer, Jerome & Torshen, Ltd., Chicago, Ill., for plaintiffs-appellants.

James N. Karahalios, Law Office of James N. Karahalios, Chicago, Ill., for defendants-appellees.

Before POSNER and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

The overtime provisions of the Fair Labor Standards Act entitle an hourly worker who works more than 40 hours a week to be paid at the rate of 1.5 times his normal wage for each hour over 40. See 29 U.S.C. § 207(a)(1). However, the provisions do not apply to employees of "a retail or service establishment" if the employee's regular rate of pay is more than 1.5 times the minimum wage and if "more than half his compensation for a representative period (not less than one month) represents commissions on goods or services." 29 U.S.C. § 207(i). The main question in this appeal from the dismissal of a complaint, 639 F.Supp. 330 (N.D.Ill.1986), charging violations of (among other things) the overtime provisions is whether the percentage service charges that hotels and restaurants characteristically add to the bill for a banquet, to compensate banquet waiters over and above their regular hourly wage, are "commissions on goods or services"; if they are, the overtime provisions are inapplicable. The question is one of first impression, and potentially one of first importance to the hotel and restaurant industry. That it has not arisen before may be due to the fact that although the exception for commissions dates back to a 1961 amendment to the Fair Labor Standards Act, hotels and restaurants have been subject to the overtime provisions of the Act only since 1975, and fully subject only since 1979.

The essential facts bearing on this question are simple, and uncontested. The plaintiffs are eleven banquet waiters employed by the Ritz-Carlton Hotel, one of Chicago's (and the nation's) interest. Their hourly wage is more than 1.5 times the

minimum wage. The hotel adds an 18 percent service charge to every banquet charge and distributes 16 percent among the staff serving the banquet, according to rank (captain, waiter, busboy, etc.), and the rest among the banquet sales staff. The amount allocable to each rank is divided equally among the employees of that rank, without regard to the number of diners served by each employee. The banquet waiters frequently work more than 40 hours a week, and the additional compensation they get from the service charge invariably exceeds their base pay. In one week, for example, plaintiff Mechmet worked 51 hours and was paid $169.29 in regular wages and $766.29 as his share of the service charges, so that his average wage exceeded $18 an hour. This system, whereby the banquet staff receives substantial compensation out of service charges but is not paid time and a half for overtime, has been in operation at the Ritz-Carlton since the hotel opened in 1975 and, we were told at argument without contradiction, is the standard system used by the American hotel and restaurant industry in the provision of banquets.

The most common type of commission in this country is the sales commission, which the banquet service charge (except the 2 percent distributed among the sales staff) is not. But as the plaintiffs' counsel conceded at argument, persons not engaged in the sale of goods—receivers, trustees, bailees, and others—are sometimes compensated in the form of what are commonly called commissions, and he conceded that these are "commissions" within the meaning of 29 U.S.C. § 207(i) if the other requirements of the section are satisfied. The defendants' counsel argued that any form of compensation based on a percentage of sales is a commission within the meaning of the statute; and this may well be permissible semantically. See, e.g., Black's Law Dictionary 339 (rev. 4th ed. 1968). But it would not be sensible to try to decide this case on the basis of dictionary meanings, or for that matter common legal usages, of the word "commission." When the Fair Labor Standards Act was passed, and later when the "commissions"

exemption was added, hotel and restaurant employees weren't subject to the Act's overtime provisions. We do not want to create an unintended loophole in the Act by a literal-minded application of section 207(i) to a situation not foreseen when the section was added. And we shall not make the artificial assumption that when Congress brought hotel and restaurant employees under the Act in 1975 it considered the bearing of section 207(i) on banquet waiters, for there is no evidence of such consideration and we know better than to assume legislative omniscience. But cf. *Rodriguez v. United States*, —— U.S. ——, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987). Moreover, even if Congress (or, more realistically, some members of Congress) thought about this interesting question of coverage, it may not have tried to resolve it. It may have preferred to leave resolution to the courts. Congress cannot be forced to resolve all the questions that new legislation creates, even if it foresees them. See Levi, An Introduction to Legal Reasoning 30–31 (1949).

Since the meaning of the word "commissions" in section 207(i) is not clear just from reading the provision, we ask what interpretation would best advance the legislative purpose. This requires us to consider how the "commissions" exemption functions in the overall scheme of the overtime provisions and whether its functioning would be assisted by classifying banquet service charges as commissions.

■ The legislative history of the overtime provisions suggests that the requirement of paying time and a half for overtime work had a threefold purpose. See H.R.Rep. No. 1452, 75th Cong., 1st Sess. (1937); S.Rep. No. 884, 75th Cong., 1st Sess. (1937); cf. *Donovan v. Brown Equipment & Service Tools, Inc.*, 666 F.2d 148, 152 (5th Cir.1982); Sargent, *Economic Hazards in the Fair Labor Standards Act*, 6 Law & Contemp.Prob. 422, 428 (1939); on the effects of the provisions see Ehrenberg & Schumann, *The Overtime Pay Provisions of the Fair Labor Standards Act*, in The Economics of Legal Minimum Wages 264 (Rottenberg ed. 1981).

The first purpose was to prevent workers willing (maybe out of desperation, though this is no longer very likely) to work abnormally long hours from taking jobs away from workers who prefer to work shorter hours. In particular, unions' efforts to negotiate for overtime provisions in collective bargaining agreements would be undermined if competing, non-union firms were free to hire workers willing to work long hours without overtime. The second purpose was to spread work and thereby reduce unemployment, by requiring an employer to pay a penalty for using fewer workers to do the same amount of work as would be necessary if each worker worked a shorter week. The third purpose was to protect the overtime workers from themselves: long hours of work might impair their health or lead to more accidents (which might endanger other workers as well). This purpose may seem inconsistent with allowing overtime work if the employer pays time and a half, but maybe the required premium for overtime pay is intended to assure that workers will at least be compensated for the increased danger of working when tired.

In reciting these purposes we do not endorse them; that isn't our business. Wages and hours legislation may be a gratuitous interference with the free market in labor, and one that bears hardest on marginal workers—those not worth the minimum wage, or time and a half for overtime—in order to prevent them from competing with the better-paid, more skilled workers. See generally Brown, Gilroy & Kohen, *The Effect of the Minimum Wage on Employment and Unemployment*, 20 J.Econ.Lit. 487 (1982); Linneman, *The Economic Impacts of Minimum Wage Laws: A New Look at an Old Question*, 90 J.Pol. Econ. 443 (1982); Mincer, *Unemployment Effects of Minimum Wages*, 84 J.Pol.Econ. S87 (1976). Our business is to discern, rather than moralize over, the legislative purposes.

■ The Department of Labor regulation published in 29 C.F.R. § 779.414 helps us see that none of the purposes that we have identified for the overtime provisions would be served by holding the provisions applicable to employees working in what the regulation calls "'big ticket' departments and those establishments or parts of establishments where commission methods of payment traditionally have been used," such as "those dealing in furniture, bedding and home furnishings, floor covering, draperies, major appliances, musical instruments, radios and television, men's clothing, women's ready to wear, shoes, corsets, home insulation, and various home custom orders." (The banquet departments of hotels and restaurants are not listed, but could well be, since commission-type methods of payment are traditionally used there as well.) The commission employees in the listed departments and establishments often work irregular hours—sometimes more than 40 in one week—but they do not do so out of desperation, nor are they taking jobs away from people who would prefer to work fewer hours. Nor, to touch on the third theme in the literature on overtime work, on which see generally Schuster & Rhodes, *The Impact of Overtime Work on Industrial Accident Rates*, 24 Industrial Rel. 234 (1985), is working long hours in a service establishment likely to result in workplace accidents that are due to worker fatigue.

The employees in such establishments may not even be working more than 40 hours a week—on average. An automobile salesman, for example, might have a very good week in which he worked 50 hours and earned huge commissions, followed by a slack week in which he worked much less and earned much less. It would not be easy for the employer to cope with the irregular conditions of the salesman's job by placing a 40–hour ceiling on each salesman's weekly work and then hiring additional salesmen to take up the slack. If instead the employer paid the salesman time and a half for overtime during the busy weeks, this would just amplify the weekly fluctuations in the salesman's earnings, especially since, in the long run, either the base pay (if above the minimum wage), or the commission rate, or both, would decline, to offset the overtime premium. It is hard to see how any of the

intended beneficiaries of the Fair Labor Standards Act—a statute primarily designed as we have said to limit competition from marginal workers, that is workers willing to accept substandard wages or to work overtime without demanding a premium—would be helped by the imposition of the overtime provisions of the Act in this setting. Hence 207(i). (And also 207(f), an exemption for employees who work irregular hours, but for a fixed wage rather than a commission. See discussion of this provision in *Donovan v. Brown Equipment & Service Tools, Inc., supra,* 666 F.2d at 153.)

The situation is the same with hotel and restaurant banquets. Each banquet at the Ritz-Carlton is a big-ticket item, costing thousands of dollars and requiring a concentrated effort by the banquet staff. And the demand for banquets at a given hotel is irregular—it is, one might say, a matter of feast or famine. Moreover, the length of a banquet cannot easily be gauged in advance, since it depends on how good a time the banqueters are having. It would be impossible in these circumstances to arrange things so that every banquet waiter worked 40 hours every week. In a busy week the Ritz's small staff of regular banquet waiters (there are only 10) may have to work additional hours in order to take care of all the banquets. The staff could be paid time and a half for the extra work, but an alternative—and judging from the figures in the record a more lucrative—approach, from the standpoint of the waiters themselves, is to let them divide up the service charge that the hotel affixes to every banquet charge. The waiters are not underpaid. The record suggests that the hourly pay of the plaintiffs, including "commissions," never fell below $14 and sometimes exceeded $18. These amounts are three to four (and more) times the minimum wage. The plaintiffs are not the marginal, non-unionized workers for whom the overtime provisions were designed; they are the employees of a big-ticket department, whom section 207(i) was intended to exempt, provided that more than half of their income was commission income and the other conditions of the section were fulfilled. Commission income is a permissible characterization of the banquet service charges that the banquet waiters received, and one that advances the statutory purposes.

We attach no weight to the fact that the collective bargaining agreement between the Ritz-Carlton and its waiters describes the waiters' income from the service charge as a "gratuity" rather than as a "commission." A "gratuity" is a tip. The plaintiffs concede that the service charge is not a tip, since it is not discretionary with the customer. This concession shows that the parties were not choosing their words with care when they drafted this provision. That is not surprising. The relevant language in the agreement predates the extension of the overtime provisions of the Fair Labor Standards Act to the hotel and restaurant industry, so the parties had no reason to choose their words carefully. The service charge is more like a commission (which in common parlance often just means a percentage-based charge or fee) than a gratuity; and to classify it as a commission not only fits the language of the statute comfortably but also carries out the statute's purposes. The fact that a contrary interpretation might cause considerable turmoil in a major industry without benefiting anyone except lawyers (the plaintiffs' counsel conceded that it might not benefit her clients) is not a sufficient reason for our decision, but it is not an irrelevant consideration either.

We realize that the Supreme Court has said that exemptions from the Fair Labor Standards Act, because it is "humanitarian and remedial legislation," must be narrowly construed. E.g., *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945). It is not easy, today, to accept such a description of a statute that appears, as we said earlier, to bear hard on the poorest class of workers. But in any event generalizations about interpretation, such as that exemptions from remedial statutes should be narrowly construed, are at best tie-breakers (and not even that, if some offsetting "canon of construction" is in play, as normally there

will be, see Llewellyn, The Common Law Tradition: Deciding Appeals 521–35 (1960)). We do not think we face a tie in this case. Given the purposes of the Act and of its exemptions, the percentage service charges used to compensate the Ritz-Carlton's banquet waiters can only be "commissions."

The plaintiffs allege not only a violation of the Fair Labor Standards Act but also a violation of the overtime provisions of state law and a breach of the collective bargaining agreement. The district court dismissed the latter two counts also on the defendants' motion for summary judgment. Although other counts, and a counterclaim, remain pending in the district court, they involve additional parties; so the district court was authorized to enter final judgment on the counts he dismissed under Fed.R.Civ.P. 54(b), and he did so.

The dismissal of the state-law count on the merits may seem improper, because when all the federal claims fall out before trial the judge should relinquish jurisdiction over any pendent state law claims (the state law claim in this case was pendent) rather than deciding their merits. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). But like all legal principles, this one mustn't be, and hasn't been, see, e.g., *Graf v. Elgin, Joliet & E. Ry.*, 790 F.2d 1341, 1346–48 (7th Cir.1986), pushed to an absurd extreme. Illinois' counterpart to the Fair Labor Standards Act excepts from its overtime provisions "any commissioned employee as described in paragraph (i) of Section 7 of the Federal Fair Labor Standards Act." Ill.Rev.Stat. ch. 48, ¶ 1004a(2)(F). Having decided whether the plaintiffs were commissioned employees under the federal statute, the judge had automatically decided their status under the state statute as well, and therefore no purpose would have been served by relinquishing jurisdiction to the state courts. Cf. *Graf v. Elgin, Joliet & E. Ry., supra*, 790 F.2d at 1348.

The only other question is whether the judge erred in rejecting the plaintiffs' claim under section 301 of the Taft-Hartley Act, 29 U.S.C. § 185. This section confers federal jurisdiction over suits for breach of collective bargaining agreements. But where, as is usually the case and was here, the agreement makes arbitration the exclusive remedy for resolving disputes, an employee can sue his employer for breach only if the employee has been unable to obtain relief through the grievance-arbitration procedure because the union has breached its duty to represent the members of the collective bargaining unit fairly. *Vaca v. Sipes*, 386 U.S. 171, 183–86, 87 S.Ct. 903, 913–14, 17 L.Ed.2d 842 (1967). The complaint in this case did not allege a breach of the duty of fair representation; and the defendants, in moving for summary judgment on the contract count, attached the affidavit of their director of personnel stating that the plaintiffs had never filed a grievance. If uncontradicted, this affidavit would have required the dismissal of the contract count even if the failure to plead a breach of the duty of fair representation was overlooked. The proof of such a breach is a prerequisite to maintaining a suit against the employer under section 301, and if a worker doesn't even ask his union to press a grievance for him he can hardly complain that it has failed to represent him. (This is also, and equivalently, the requirement that the worker exhaust his union remedies before bringing suit. See *id.* at 184, 87 S.Ct. at 913–14.) The plaintiffs riposted, however, with an affidavit by plaintiff Mechmet which states that Grossman, the union griever, refused for years to take any steps to rectify the alleged violation. We shall assume without having to decide that this submission rectified the plaintiffs' oversight in pleading. Cf. Fed.R.Civ.P. 15(b).

The collective bargaining agreement provides that employees who work more than 40 hours a week shall receive overtime pay at the rate of time and a half. The agreement also requires that an 18 percent service charge be added to all banquet charges and the receipts from it be divided up among the banquet workers. These provisions go back to 1975 but apparently have not been interpreted (except by the plaintiffs) to entitle the banquet waiters to

time and a half when they work more than 40 hours a week. One reason may be that the 40 hours are a construct rather than a measure of time actually worked. They are computed by assigning an artificial amount of time to each function performed in a banquet (e.g., 2 hours for setting up, 4 hours for dinner, and 2 hours for cleaning up), even if it doesn't take so long to perform the function for a particular banquet.

The agreement establishes a grievance procedure, that is, a procedure for resolving disputes over the correct interpretation of the agreement. The first step is for the union, a shop steward, or an employee or group of employees to discuss the matter with a supervisor or department head. If the matter cannot be resolved at this level, the union representative ("griever") must submit the grievance in writing to the employer. Mechmet's affidavit states that he discussed his grievance with his immediate supervisor, to no avail, and then complained to Grossman, but that Grossman—for seven years, beginning in 1977—refused to carry the matter further, fobbing Mechmet off with all sorts of phony excuses, such as that the grievance would have to be signed by all the banquet waiters, which the collective bargaining agreement clearly does not require.

Mechmet's affidavit is implausible, to say the least. Since he is a shop steward, he must surely have known that the grievance did not have to be signed by all the banquet waiters—did not have to be signed by anyone but Grossman, for that matter. The affidavit has all the signs of having been concocted hurriedly and with scant regard for truth when the plaintiffs' counsel realized that Count III depended on establishing a breach of the union's fair duty of representation, which had not been alleged. But it is not a proper office of summary judgment to resolve questions of credibility except in the most extreme cases (illustrated by *By-Prod Corp. v. Armen-Berry Co.*, 668 F.2d 956, 959–60 (7th Cir.1982)), so we shall assume that everything in Mechmet's affidavit is true. Nevertheless the district court properly dismissed this count. Grossman's deposition states without contradiction that on August 14, 1984, Mech-

met told him to hold up filing the grievance till one of the waiters got back from vacation; and a week later, when Grossman asked him whether he should proceed, Mechmet told him it was too late, that the matter was now in the hands of the lawyers. This suit was in fact filed just three days later.

Having prevented Grossman from filing a grievance, Mechmet and his coplaintiffs will not be heard to accuse the union of having breached its duty of fair representation by failing to grieve his complaint. "Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced," and therefore "must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement." *Vaca v. Sipes, supra,* 386 U.S. at 184, 87 S.Ct. at 914. This was not done here. Cf. *Roman v. United States Postal Service,* 821 F.2d 382, 389–90 (7th Cir.1987).

There is a further point. While the plaintiffs may conceivably have had something to gain from suing the defendants under the Fair Labor Standards Act, which provides for liquidated damages even if a plaintiff suffers no actual damages, we find it impossible to see what they had to gain from filing a grievance with the union. They have never indicated how they might be better off if entitled to overtime, since, rather than paying it, the hotel might well decide to reduce their hours of work. Or it might cut their base pay, since if unable to work overtime without a premium they would be less valuable employees. They are, after all, already highly compensated, so it is unlikely that a victory in this lawsuit will improve their net position, and it might worsen it. Their counsel admitted in the district court and again at argument in our court that her clients might not benefit from winning an entitlement to overtime. (On the incentives of both employer and employee to avoid the overtime provisions of the Fair Labor Standards Act see Ehrenberg & Schumann, *Compliance With the*

*Overtime Pay Provisions of the Fair Labor Standards Act,* 25 J. Law & Econ. 159 (1982).) It is not a breach of the duty of fair representation for a union to refuse to prosecute a nuisance grievance, one that might embarrass management but is unlikely to benefit any of the employees. See *Camacho v. Ritz-Carlton Water Tower,* 786 F.2d 242, 245 (7th Cir.1986). If Grossman did stonewall the plaintiffs, as Mechmet's affidavit unconvincingly asserts, this may well have been justified by the absence of any demonstrable benefit to the full-time workers in the bargaining unit from prosecuting it, though part-time workers might have benefited. Such tradeoffs are for the union to make, not a court. See *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953); *Baker v. Construction & General Laborers, Local No. 264,* 822 F.2d 781, 784 (8th Cir.1987); *Hays v. National Electrical Contractors Ass'n, Inc.,* 781 F.2d 1321 (9th Cir.1985).

A~FFIRMED~.