In re **VIRTUAL NETWORK SERVICES CORP.**, Debtor.

**VIRTUAL NETWORK SERVICES CORP.**, Appellant,

v.

**UNITED STATES of America**, Appellee.

No. 88 C 5404.

United States District Court, N.D. Illinois, E.D.

April 28, 1989.

See also, Bkrtcy., 97 B.R. 433.

**344**

Steven B. Towbin, Steven T. Bobo, Scott N. Schreiber, Towbin & Zazove, Ltd., Chicago, Ill., for appellant.

Debra L. Stefanik, Trial Lawyer, U.S. Dept. of Justice, Washington, D.C., for appellee.

ZAGEL, District Judge.

Virtual Network Services Corp. (VNS) operated a long-distance telephone services company during 1985 and 1986. It fell on hard times, however; and in September of 1986 VNS sought relief under Chapter 11 of the Bankruptcy Code. VNS became a debtor-in-possession, operating its business (and administering its estate) for the benefit of its creditors. See 11 U.S.C. secs. 1107, 1108. In December of 1986, VNS sold all of its operating assets, and soon after proposed a plan of reorganization liquidating itself. See 11 U.S.C. sec. 1123(b)(4). In March of 1987, the United States, through the Internal Revenue Service, filed a claim for $625,118.78, including $63,022.79 in penalties. VNS objected to the government's claim, arguing that the penalty portion should be subordinated to the claims of the general unsecured creditors. The bankruptcy judge thought otherwise; he ruled that the penalty amount should not be subordinated. VNS appeals from that ruling.

**I**

The issue presented by this case is whether the bankruptcy court erred by declining to subordinate the government's claim for prepetition penalties. Resolution of this issue, however, involves exploration of many interesting collateral issues, and to those we now turn.

**A**

In its argument to the bankruptcy judge, VNS maintained initially that sec. 726(a), which provides for automatic subordination of penalty claims in Chapter 7 liquidations, is applicable to Chapter 11 liquidations. See VNS's Reply to United States' Response, R.3 at 4–7. VNS relied on two bankruptcy court decisions, *In re Compton Corp.*, 40 B.R. 875 (Bankr.N.D.Tex.1984), and *In re Erlin Manor Nursing Home, Inc.*, 36 B.R. 672 (Bankr.D.Mass.1984), aff'd, 86 B.R. 307 (D.Mass.1985), portions of the House Committee Report addressing sec. 1129(a)(7), see H.R.Rep. 594, 95th Cong., 1st Sess. 412–13 (1977), and "policy reasons" in support of its position.

The government responded that under sec. 103(b) of the Code, 11 U.S.C. sec. 103(b), subchapters I and II of Chapter 7 (sec. 726(a) is part of subchapter II) "apply only in a case under such chapter." It is difficult to conceive of a more straightforward directive. We have said on other occasions that when the judiciary decides a case governed by a statute, it resolves a dispute according to a command given by the political branches. See *In re Elias*, 98 B.R. 332, 336 (N.D.Ill.1989); see also Easterbrook, *Legal Interpretation and the Power of the Judiciary*, 7 Harv.J.L. & Pub.Pol'y 87, 97 (1984). Courts are not Solomonic councils empowered to revise legislative enactments on the ground that they are ill-conceived. See *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1176 (7th Cir.1987). When the political branches pass a law (assuming it is constitutional), as they have done here, the judiciary's only role is to apply it. To read the Code as VNS suggests would nullify sec. 103(b), surely an odd way of "interpreting" any statutory text. See *Mountain States Tel. & Tel. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed. 2d 168 (1985).

The aspect of the argument relying on the House Committee report requires little comment. Legislative history can be used to explain statutory text, not contradict it. *In re Sinclair*, 870 F.2d 1340 (7th Cir. 1989). Statutory text, rather than a congressional staff's explanation of it, is the law under the Constitution. And it is *that*

law the judiciary must apply. Judge Katz properly rejected this argument.

### B

But this was not the only argument VNS made. Rather late in the day (in its Surreply to the United States' Supplemental Response) VNS pointed out that its request to subordinate the government's penalty claim was proper under either sec. 726(a)(4) *or* sec. 510(c)(1). The only other mention of sec. 510(c)(1) by VNS is found in a footnote in its Reply Brief.

Nevertheless, sec. 510(c)(1) is the centerpiece of this appeal. It provides that the bankruptcy "court may * * * under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim * * *." Our dispute hinges on the meaning of the phrase "under principles of equitable subordination." This case cannot be decided by resort to the statute's "plain meaning", for nowhere in the text are the principles of equitable subordination defined. But how do we ascertain the meaning of so vague a phrase? Where the text does not provide a clear answer, "we ask what interpretation would best advance the legislative purpose." *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175 (7th Cir.1987). This in turn requires us to determine the legislative purpose underlying sec. 510. The government maintains that sec. 510(c)(1) is a codification of the judicially-created principles of equitable subordination that the courts had developed prior to the enactment of the 1978 Act, see *Davis v. Michigan Dept. of Treasury*, —— U.S. ——, 109 S.Ct. 1500, 1506, 103 L.Ed.2d 891 (1989); and that one of these principles is that the creditor whose claim is to be subordinated must have acted inequitably. Since the government has not acted inequitably here, the reasoning continues, the bankruptcy judge correctly refused to subordinate its claim for penalties.

VNS, on the other hand, maintains that sec. 510(c)(1) empowers the bankruptcy court to subordinate a penalty claim in a Chapter 11 liquidation based on its punitive nature. Penalties are designed to punish wrongdoing and deter it in the future, and neither goal can be accomplished in a liquidation case, since no entity exists to be punished or deterred. Other creditors must foot the bill for the debtor's misconduct. And surely that is inequitable.

Both VNS and the government find support for their positions in the Code's legislative history, "the ashcans of the legislative process." C. Curtis, *It's Your Law* 52 (1954). This is no surprise, however, for the process lends itself to the contrary expressions of Members and staff. *See generally* Dickerson, *Statutory Interpretation: Dipping into Legislative History*, 11 Hofstra L.Rev. 1125 (1983). One need not leaf through the Federal Reporter long to detect a growing restiveness with the judiciary's readiness to consult extrinsic materials, rather than text and structure, to ascertain a given statute's meaning. See, e.g., *In re Sinclair*, 870 F.2d 1340 (7th Cir.1989); *Trustees v. Allied Products Corp.*, 872 F.2d 208 (7th Cir.1989); *Covalt v. Carey Canada Inc.*, 860 F.2d 1434 (7th Cir.1988); *In re Kelly*, 841 F.2d 908 (9th Cir.1988); *IBEW v. NLRB*, 814 F.2d 697, 715–20 (D.C.Cir.1987) (Buckley, J., concurring); *FEC v. Rose*, 806 F.2d 1081, 1089–90 (D.C.Cir.1986); *Wallace v. Christensen*, 802 F.2d 1539, 1559–60 (9th Cir.1986) (Kozinski, J., concurring); *Hirschey v. FERC*, 777 F.2d 1, 7–8 (D.C.Cir.1985) (Scalia, J., concurring); *see also* Starr, *Observations About the Use of Legislative History*, 1987 Duke L.J. 371, 375–79; Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv.J.L. & Pub. Pol'y 59 (1987).

Consider the following weaknesses with consulting legislative history: it carries with it the potential for overriding statutory text—the *law* under the Constitution—in favor of a staff member's explanation (or, worse yet, description) of the text; and this potential creates a powerful incentive for disgruntled Members, staff, or lobbyists to smuggle their views into the extrinsic materials in the hope that one day a court will elevate them to the status of law; it is costly, and the more voluminous the

materials to consult, the higher the transaction costs (and lest one find this fanciful, consider that one of the principal drafters of the 1978 Bankruptcy Reform Act has authored an entire law review article detailing its legislative history, *see* Klee, *Legislative History of the New Bankruptcy Code,* 28 De Paul L.Rev. 941 (1979)); and it ignores entirely the Executive, who signs the text, not explanatory notes or statements, into law. And all of this displaces power from the political branches to the courts, for it gives judges discretion, and discretion translates into power. See *Marozsan v. United States,* 852 F.2d 1469, 1498 (7th Cir.1988) (Easterbrook, J., dissenting). These concerns suggest courts should look to extrinsic materials grudgingly—if at all —when interpreting a statute. But, in fact, the Supreme Court's use of legislative history has increased dramatically over the last 50 years. *See* Carro & Brann, *The U.S. Supreme Court and the Use of Legislative Histories: A Statistical Analysis,* 22 Jurimetrics 294 (1982). But this development may not be as ominous as it appears. Legislative history may prove invaluable when construing an ambiguous text. *In re Sinclair,* 870 F.2d 1340 (7th Cir. 1989). And as legislation is increasingly used to regulate human conduct, perhaps an inevitable side-effect is ambiguity. *Cf.* G. Calabresi, *A Common Law for the Age of Statutes* (1982). With these considerations in mind, we examine both parties' use of legislative history.

In support of its reading of sec. 510, VNS points to the House Judiciary Committee Report, which states that sec. 510(c)(1):

permits the court to subordinate, on equitable grounds, all or any part of an allowed claim or interest to all or any part of another allowed claim or interest, and permits the court to order that any lien securing claim subordinated under this provision be transferred to the estate. This section is intended to codify case law, such as *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and *Taylor v. Standard Gas and Electric Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1938), and is not intended to limit the court's power in any way.

The bankruptcy court will remain a court of equity, proposed 28 U.S.C. 1481; *Local Loan v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). Nor does this subsection preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances. *See Pepper v. Litton, supra. The court's power is broader than the general doctrine of equitable subordination, and encompasses subordination on any equitable grounds.*

H.R.Rep. No. 595, 95th Cong., 1st Sess. 359 (1987), *reprinted in,* 1978 U.S.Code & Cong. Admin.News 5787, 5963, 6315 (emphasis supplied).

This language unquestionably supports VNS's position. Unfortunately, it refers to proposed text that was not enacted into law. As originally written, H.R. 8200 permitted the bankruptcy court to subordinate a claim "on equitable grounds." The enacted version of the bill, however, requires that subordination be made "under principles of equitable subordination", rather than "on equitable grounds." Given this modification, one could argue that the House committee's broad understanding of the bankruptcy court's subordination power was rejected. We hesitate to draw this conclusion, however, because "[s]uccessive drafts of a statute are not stages in its development. They are separate things of which we can say only that they followed each other in a definite sequence, and that one was not the other. But that fact gives us little information about the final form, since we never really know why one gave way to any other." Radin, *Statutory Interpretation,* 43 Harv.L.Rev. 863, 873 (1930). Nevertheless, it does seem safe to say that *this* language does not support the expansive meaning which VNS attributes to the enacted version of sec. 510(c)(1).

The Senate version of H.R. 8200, S. 2266, provided, like the enacted version of sec. 510(c)(1), that subordination must be based on "principles of equitable subordination." The Senate Judiciary Committee reported that its version:

provides * * * that any subordination ordered under this provision must be based

on principles of equitable subordination. These principles are defined by case law, and have generally indicated that a claim may normally be subordinated only if its holder is guilty of misconduct. As originally introduced, the bill provided specifically that a tax claim may not be subordinated on equitable grounds. The bill deletes this expression, but the effect of the amendment should be much the same in most situations since, under the judicial doctrine of equitable subordination, a tax claim would rarely be subordinated. S.Rep. No. 989, 95th Cong., 2d Sess. 74 (1978), *reprinted in,* 1978 U.S.Code & Cong. Admin.News 5787, 5860.

The government reads this to mean that creditor misconduct is a necessary (but not a sufficient) condition of equitable subordination under sec. 510(c)(1). This conclusion follows, it is argued, from the statement that the "principles of equitable subordination" are "defined by case law"; and case law requires as a condition of subordination some inequitable conduct by the creditor whose claim is to be subordinated. We see two obstacles standing in this path. First, the committee was careful to point out that only *normally* does equitable subordination require creditor misconduct; this, in turn, implies that there are situations in which a claim can be subordinated even though the creditor has done nothing inequitable. Second, there is *In re Stirling Homex Corp.,* 579 F.2d 206 (2d Cir. 1978), a case decided under Chapter X of the 1898 Bankruptcy Act about one month before the Senate committee issued its report; and therefore we may reasonably infer that the Senate committee was aware of it. There the Second Circuit held that defrauded shareholders' claims against an insolvent corporation were properly subordinated to the claims of the general unsecured creditors even though the shareholders engaged in no inequitable conduct. *Stirling* thus illustrates that creditor misconduct was not a necessary condition of equitable subordination at the time the Senate committee issued its report.

The government also contends that the Senate report's discussion of subordinating tax claims weighs in its favor. Although the original provision prohibiting equitable subordination of tax claims was deleted, the staff thought it clear that tax claims would "rarely be subordinated" under the "judicial doctrine of equitable subordination." But *why* did the committee's staff believe this? According to the government, it's because equitable subordination requires creditor misconduct; and the Commissioner would rarely act inequitably. Granted, equitable subordination based on governmental misconduct will be rare. But "rare" might also refer to the committee's belief that Chapter 11 liquidations would be scarce. It might also reflect the belief that claims for non-compensatory tax penalties in Chapter 11 liquidations would be uncommon. Or, more likely yet, the staff (and Members) simply did not foresee the problem of subordination in the context of Chapter 11 liquidations. *See generally* Epling, *Proposal for Equality of Treatment for Claims in Chapter 7 and Claims in a Liquidating Chapter 11 Case,* 4 Bankr.Dev.J. 399 (1987). Given the automatic subordination provision in Chapter 7, there was no need to fret about subordinating penalty claims in liquidations, they were already provided for—not in Chapter 11 liquidations.

The government also relies on the committee reports regarding sec. 724(a). Both state:

> Subsection (a) of section 724 permits the trustee to avoid a lien that secures a fine, penalty, forfeiture, or multiple, punitive or exemplary damages claim to the extent that the claim is not compensation for actual pecuniary loss. The subsection follows the policy found in section 57j of the Bankruptcy Act of protecting unsecured creditors from the debtor's wrongdoing, but expands the protections afforded. The lien is made voidable rather than void in chapter 7, in order to permit the lien to be revived if the case is converted to chapter 11, under which penalty liens are not voidable. To make the lien void would be to permit the filing of a chapter 7, the voiding of the lien, and the conversion to a chapter 11, sim-

ply to avoid a penalty lien, which should be valid in a reorganization case.

S.Rep. No. 989, 95th Cong., 2d Sess. 96 (1978), *reprinted in,* 1978 U.S.Code & Cong. Admin.News 5787, 5882; H.R.Rep. No. 595, 95th Cong., 1st Sess. 382 (1977), *reprinted in,* 1978 U.S.Code & Cong. Admin.News 5963, 6338.

The government argues that this language demonstrates that Congress was aware that penalties would not be subordinated in Chapter 11 cases. Once again, we find this less than compelling. It is true that the reports indicate that penalty liens are not voidable in a Chapter 11 case. But both also say that penalty liens "should be valid in a *reorganization* case." The committees obviously were concerned with the prospect of insolvent debtors filing for relief under Chapter 7 in order to avoid their liability for non-compensatory penalties secured by a lien; and once having done so, converting from a straight liquidation under Chapter 7 to a reorganization (not a liquidation) under Chapter 11. To permit this result would frustrate several important goals of federal law. It would allow debtors to dodge the legitimate claims of their creditors, and enable wrongdoers to escape punishment designed to give them and others pause before acting that way in the future (deterrence). These are legitimate concerns in the reorganization context. But they do not stand up in liquidation proceedings, where no entity remains to be punished or to escape paying debts it incurred before filing for relief. These differences are so pronounced that we cannot draw from the legislative history of sec. 724(a) the inference that Congress meant to prohibit the equitable subordination of penalty claims in a Chapter 11 *liquidation.* Neither report contains the slightest glimmer that the committees were even aware of the differences presented by Chapter 11 reorganizations and liquidations. And this is not terribly surprising: it is unclear why a debtor who has filed for relief under Chapter 7 (and received automatic subordination of non-compensatory penalty claims) would attempt to convert to a Chapter 11 *liquidation.* Converting can be an expensive proposition,

and it is less than obvious what gains might offset the transaction costs incurred in the conversion. Cf. *In re Jartran, Inc.,* 71 B.R. 938, 943–45 (Bankr.N.D.Ill.1987); *see also* Anderson & Wright, *Liquidating Plans of Reorganization,* 56 Amer.Bankr. L.J. 29 (1982).

We now arrive at the statements of two of the sponsors of this legislation, Rep. Donald Edwards and Sen. Dennis DeConcini. But first a little background. Although the House and Senate passed different versions of the bill, they did not follow the normal procedure of holding a formal conference to resolve their differences. Rather, they ironed them out in negotiations between Congressmen Edwards and Butler and Senators DeConcini and Wallop, leaders of the legislation in their respective chambers, as well as staff members from both committees. *See* Kennedy, *Foreword: A Brief History of the Bankruptcy Reform Act,* 58 N.C.L. Rev. 667, 676–77 (1980). Because no formal conference was used, there is no conference report. The results of the negotiations, however, are set out in the long and nearly identical statements of Congressman Edwards and Senator DeConcini.

Regarding sec. 510(c)(1), both stated the final version:

represents a compromise between similar provisions in the House bill and Senate amendment. * * * It is intended that the term "principles of equitable subordination" follow existing case law and leave to the courts development of this principle. To date, under existing law, a claim is generally subordinated only if [the] holder of such claim is guilty of inequitable conduct, or the claim itself is of a status susceptible to subordination, such as a penalty or a claim for damages arising from the purchase or sale of a security of the debtor. * * *

124 Cong.Rec. H11,089—H11,117 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); *id.,* S17,403—S17,434 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini), *reprinted in,* 1978 U.S.Code & Cong. Admin.News 5787, 6452, 6521.

These statements, in our view, firmly support VNS's position. Both sponsors understood sec. 510(c)(1) as incorporating previously developed principles of equitable subordination, but as leaving further development of the doctrine to the courts. This rather straightforwardly dashes the government's argument that Congress meant to "freeze" into sec. 510(c)(1) the principles of equitable subordination as they existed on the day the bill was enacted into law. And even if Congress did intend to do that, the very next sentence indicates that Congress believed (which is unsurprising in light of *Stirling*) that existing law enabled a court to subordinate a claim based solely on its nature—for example, a claim "such as a penalty". The problem VNS faces is that the statements of individual legislators are extremely unreliable. It is here that the legislative process carries the greatest potential for abuse. The floor statements of individual legislators are larded with remarks which reflect a political ("sales talk") rather than a legislative purpose. See *IBEW v. NLRB*, 814 F.2d 697, 715–17 (D.C.Cir.1987) (Buckley, J., concurring). This may be true even of a floor exchange between (or among) Members. *See* Hon. W. Moorhead, *A Congressman Looks at the Planned Colloquy & Its Effect in the Interpretation of Statutes*, 45 A.B.A.J. 1314 (1959). These concerns have led the Ninth Circuit to characterize as "stray comments" other portions of the floor statements at issue here. See *In re Kelly*, 841 F.2d 908, 912 n. 3 (9th Cir.1988) (discussing legislative history to sec. 707(b) of the 1978 Code). It is therefore no surprise that the Supreme Court has held that "[t]o the extent that legislative history may be considered, it is the official committee reports that provide the authoritative expression of legislative intent." *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984).

But the committee reports here are inconclusive; and the Supreme Court itself has relied on statements made by informed observers in hearings or floor debate. See, e.g., *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972) (statements of Sen. John Kennedy and Prof. Archibald Cox made at Senate hearings); *Lowe v. SEC*, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) (statements of industry witnesses at hearing); *Michigan Canners & Freezers Ass'n v. Agricultural Marketing & Bargaining Bd.*, 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed. 2d 399 (1984) (statements of legislators). *See also* 2A Sutherland, *Statutes and Statutory Construction* sec. 48.13 (4th ed. 1984). And floor statements by individual Congressmen are entitled to greater weight where, as here, they are made by the sponsors of the legislation. This is so because sponsors are the most knowledgeable legislators, and their understanding of a proposed bill's purposes and effects are relied upon by other legislators. See *United Steelworkers of America v. Weber*, 443 U.S. 193, 230–53, 99 S.Ct. 2721, 2741–52, 61 L.Ed.2d 480 (1979) (Rehnquist, J., dissenting); *see also* W. Eskridge & P. Frickey, *Legislation: Statutes and the Creation of Public Policy* 735 (1988).

Congressman Edwards was a sponsor and the House floor manager of the bankruptcy legislation. His enormous effort in passing the bankruptcy legislation is acknowledged in the secondary literature. *See, e.g.,* Klee, *Legislative History of the New Bankruptcy Code*, 28 De Paul L.Rev. 941 (1979), and Kennedy, *Foreword: A Brief History of the Bankruptcy Reform Act*, 58 N.C.L.Rev. 667 (1980). Senator DeConcini, while not as heavily involved as Rep. Edwards, was the Chairman of the Senate Judiciary Committee's Subcommittee on Improvement in Judicial Machinery; and he co-sponsored the Senate version of the bill (Senator Malcolm Wallop, ranking minority member of the subcommittee, was the co-sponsor). Both Rep. Edwards and Sen. DeConcini were among the Members who, in lieu of a formal conference between the House and Senate, met to negotiate and hammer out the differences in the respective bills. These statements take on added importance in light of then-Assistant Attorney General for Legislative Affairs (now Judge) Patricia Wald's observation that the bankruptcy legislation was enacted despite being "understood and discussed by only a

small fraction of the legislators who passed the final bill in the feverish pace of the last days of the session [of Congress]." Wald, *Justice in the Ninety-fifth Congress: An Overview*, 64 A.B.A.J. 1854, 1855 (1978). This comment is significant because it supports the position that some—if not many—Members who voted on the legislation relied on the statements by Rep. Edwards and Sen. DeConcini. Since few legislators read or discussed the text of the bills, it makes it more likely that they relied on these statements as their principal source of information about the bills.

■ What does all of this mean? We are left with committee reports which are at best inconclusive, and statements by the sponsors of the legislation which unambiguously indicate that sec. 510(c)(1) was intended to codify the judicially-created principles of equitable subordination, but which also left to the courts the task of "developing" the doctrine. Because the sponsors' statements refer to the legislation as enacted, because they offer greater guidance, and because they are not inconsistent with the committee reports (indeed, the committee reports both address versions of the bill never enacted into law), we conclude that the statements made by Rep. Edwards and Sen. DeConcini more accurately reveal the meaning of sec. 510(c)(1) than do the committee reports. Accordingly, we believe that the legislative history favors the view that sec. 510(c)(1) does not limit the doctrine of equitable subordination to cases of creditor misconduct.

### C

But all is not at an end. The government points out that to adopt VNS's reading of sec. 510(c)(1) would nullify sec. 726(a)(4) which automatically subordinates noncompensatory penalty claims to fourth priority. And nullifying statutory text through interpretation is something judges should avoid. *Mountain States Tel. & Tel. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985). If sec. 510(c)(1) serves automatically to subordinate penalty claims, then why did Congress bother to insert a provision to the same effect in Chapter 7 procedures?

One answer is that the mandatory priority scheme established by sec. 726(a) reflects Congress' understanding of the relative standing of different types of claims. Even so, sec. 726(a) governs "[e]xcept as provided in section 510." As we understand this proviso, it means that sec. 510 can be applied to the priority scheme set out in sec. 726(a). Section 510(c)(1), under this reading, would not nullify sec. 726(a)(4); it would simply empower the bankruptcy court to subordinate under the principles of equitable subordination a claim already prioritized under sec. 726(a). This structural argument therefore fails. There is no danger of reading sec. 726(a)(4) out of the Code by interpreting sec. 510(c)(1) to permit the equitable subordination of a penalty claim in Chapter 11 liquidations.

### D

This is not to say that VNS wins. To prevail VNS must demonstrate that the equitable subordination of penalty claims is consistent with the purpose of equitable subordination, and that such application of the doctrine is not foreclosed by precedent.

The government is surely correct that the doctrine of equitable subordination does not confer upon the bankruptcy court an ambulatory source of authority to distribute a bankrupt's estate among unsecured creditors in whatever manner strikes it as "fair." But VNS does not say that it does. The government's position, again, is that sec. 510(c)(1) is restricted to instances of creditor misconduct. VNS, of course, disagrees. We think it would be useful, however, to examine whether the government's reasoning is compatible with the purpose of equitable subordination.

■ The "fundamental aim [of equitable subordination] is to undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *In re Kansas City Journal–Post Co.*, 144 F.2d 791, 800 (8th Cir.1944). That is why sec. 510(c)(1) states that equitable

subordination is to be made "for purposes of distribution." The doctrine focuses on the nature of the distribution of the bankrupt's estate among his creditors, *not* on the conduct of the creditor whose claim is to be subordinated. It may not be used punitively to punish a creditor who has acted inequitably; rather, it is to be employed only to adjust the claims of creditors as they stand in equitable relation to each other. See, e.g., *In re Mobile Steel Corp.*, 563 F.2d 692 (5th Cir.1977); *In re Sepco, Inc.*, 750 F.2d 51 (8th Cir.1984).

This, it seems to us, militates against the government's position. The *goal* of equitable subordination is to ensure that a bankrupt's estate is apportioned equitably among his creditors. One *ground* for employing the doctrine is that a creditor, through inequitable conduct, will realize a share of the estate which unjustly or unfairly reduces the shares of the other creditors. Thus we believe the government's reasoning conflates the goal of equitable subordination with the grounds for equitable subordination. By limiting the doctrine's applicability to instances of creditor misconduct, the government's argument shifts the focus of equitable subordination from the nature of the distribution of the bankrupt's estate to the nature of a given creditor's conduct. Combatting wrongdoing is not the purpose of equitable subordination; if it were, punishment would be a—if not *the*—logical choice for redressing violations. But it is not an available choice, indeed it is forbidden. A creditor who has acted inequitably cannot be punished under the doctrine of equitable subordination.

Framing the court's power in these terms, however, seems to embrace the expansive notion of equitable power we disclaimed above: for it appears to invest the courts with the authority to arrange the claims of unsecured creditors in whatever manner they deem "fair." We concede there is some danger in attempting to steer a straight course with only "fairness" as the rudder. We are not convinced, however, that this danger is sufficient to justify applying the doctrine of equitable subordination by reference to one of its grounds rather than its goal. The doctrine requires that an "unfair" distribution of the estate

exist before it may be employed. And "unfairness" is, like many other terms, a conclusion which must be justified by reference to reasons. While it is true that "fairness" is an open-ended concept, and therefore may someday become a talismanic phrase which courts use as an excuse rather than as a justification for subordinating a claim, "fear of the future, of what's at the bottom of a long, slippery slope, is not a good reason for today's decision." *Marozsan v. United States*, 852 F.2d 1469, 1499 (7th Cir.1988) (*en banc*) (Easterbrook, J., dissenting); Schauer, *Slippery Slopes*, 99 Harv.L.Rev. 361 (1985). "Courts of Equity have * * * no more discretionary power than Courts of Law. They decide new cases, as they arise, by the principles on which former cases have been decided; and may thus illustrate or enlarge the operation of those principles." 1 J. Story, *Commentaries on Equity Jurisprudence as Administered in England and America* sec. 20 (14th ed. 1918); *see also* 3 W. Blackstone, *Commentaries on the Laws of England* 433 (1979 ed.). It is no different here. The principle which must inform the bankruptcy court's decision when applying the doctrine of equitable subordination is the fair distribution of the bankrupt's estate among his creditors. We are confident that allowing courts to apply the doctrine in light of this principle will not frustrate the legislative will; we are equally confident that artificially limiting the doctrine's scope by reference to one of its grounds would do so.

### E

█ The government, giving no quarter, argues that it is not "unfair" to force innocent creditors to foot the bill for VNS's wrongdoing: "there is no legally significant difference between this result and a decrease in the available dividends caused by the debtor's wrongful failure to meet any other legal obligations which create a debt." Government's Resp. at 6.

On the contrary. We see at least two "legally significant" differences. A penalty (at least a "non-compensatory" one) serves to punish wrongdoers for their misconduct, and deter them and others from wrongdoing in the future. Punishment, on

the one hand, thus affirms the difference between right and wrong; and, as such, it serves to confirm basic precepts of social order. It follows from this that innocent persons ought not to be punished for another's wrongdoing: punishing innocent persons does not respect the difference between right and wrong—indeed it spurns the distinction—and it would mock the moral foundation on which our polity stands, rather than buttress it. *See, e.g.,* I. Kant, *The Philosophy of Law,* 194–204 (W. Hastie trans.1974). And this is precisely what is at issue here: the government wants VNS's general unsecured creditors to pay for VNS's wrongdoing, thereby punishing the other creditors, not VNS. Since VNS is liquidating it will no longer be around to suffer punishment or be deterred. Only the other unsecured creditors are left to pay. But because these creditors are not responsible for VNS's misconduct, they should not be mulcted.

Nor is deterrence a sufficient reason to force innocent creditors to pay for another's wrongdoing. According to instrumentalists (such as Bentham and Blackstone), punishment is justified because it deters misconduct by instilling potential wrongdoers with fear of the consequences of their misconduct. Admittedly, punishing innocent persons could further the goal of deterrence, but even then only if those to be deterred do not know the victims are innocent. If they did know, as here, it would create fear of the government's arbitrary use of power, rather than an incentive to abide by the rules, which is the whole purpose of deterrence. This is mere hypothesizing, however. Punishing an innocent person to deter others is not, as the elaborate panoply of protections afforded defendants in criminal cases demonstrates, acceptable in our (or any civilized) legal system. Such punishment would be arbitrary because it would be inflicted on those who did not break the rules, and who therefore did not deserve it. *See* M. Mackenzie, *Plato on Punishment* 43–50 (1981). Responsibility for wrongdoing is a necessary condition of punishment. Thus, even in the civil context, "it is not the function of the legal system to shift misfortune to the shoulders of those who [a]re not respon-

sible for it." *Pistas v. New England Mutual Life Ins. Co.,* 843 F.2d 1038, 1040–41 (7th Cir.1988) (case involving claim for actual compensation).

We recognize that the government is not responsible for VNS's wrongdoing either; and therefore one could argue that it is unfair to saddle the government with the resulting loss. There is an important distinction, however, between the government and VNS's other unsecured creditors. It is the government that VNS harmed *initially;* and having suffered misfortune which it can no longer shunt on to the responsible party's shoulders, the government must offer some justification for shifting it to those who are not responsible or bear the loss itself. Other things being equal, losses should lie where they fall. Here, because the loss has fallen on the government, and because it offers no justification for passing it on to other innocent creditors, the government must bear the loss.

There is another reason for permitting equitable subordination of penalty claims in Chapter 11 liquidations, though it is closely related to the first. Bankruptcy cases in general, and liquidation proceedings in particular, are essentially battles over where creditors stand in line to get paid. And normally creditors are attempting to recover for actual losses suffered as a result of the debtor's failure to pay for the goods and services the debtor has received from the creditors. That is not true in the case of a penalty, which (at least in its monetary form) reflects a payment over and above compensation for actual injury. It strikes us as anomalous, and "unfair", in a liquidation proceeding (where it is likely that there will not be enough assets to satisfy everyone) to permit one creditor (here, the government) to recover amounts in excess of its actual injury before all of the general unsecured creditors have been fully compensated for their actual injuries. Logic dictates that claims for actual losses should take priority over claims for losses in excess of actual injury. This, perhaps, reflects the rationale underlying sec. 726(a). It is persuasive there, and in Chapter 11 liquidations as well.

These reasons, we believe, demonstrate that it would be unfair to allow the govern-

ment to satisfy its penalty claim against VNS here. Therefore, in our view, it is consistent with the doctrine of equitable subordination, as codified by sec. 510(c)(1), to permit the bankruptcy court to subordinate the government's penalty claim to the claims of VNS's general unsecured creditors in this Chapter 11 liquidation.

## II

Section 510(c)(1) confers upon the bankruptcy court an equitable, and therefore discretionary, power. Neither side has addressed the appropriate standard of review to be applied to the bankruptcy court's order denying subordination of the government's penalty claim. But it is of no moment, for no matter what standard applies —*de novo* or abuse of discretion—it would not affect our conclusion that the judgment here must be reversed. There is no dispute that the government's penalty claim is punitive, rather than compensatory, in nature; and for the reasons spelled out above, we conclude that the government must wait until VNS's general unsecured creditors are paid in full before it can collect on the amount of the penalty.

REVERSED.